| 131 | 487 |
|-----|-----|
| 136 | 56 |

| 131 | 487 |
|-----|-----|
| 144 | 587 |

FRANK DEAN and ARTHUR DEAN, Appellants, v. CHARITY DEAN.

Action to cancel conveyance: MENTAL INCAPACITY: UNDUE INFLU-ENCE: EVIDENCE. In an action by the heirs to set aside con-veyances made by their father to his second wife shortly prior to his death, on the ground of undue influence, the evidence is reviewed and held insufficient to show an impaired mental and physical condition, except such as is incident to advancing age; or that the conveyances were the result of undue influence of the grantee.

*Appeal from Cerro Gordo District Court.*— HON. CLIF-FORD P. SMITH, Judge.

TUESDAY, SEPTEMBER 25, 1906.

ACTION to set aside the conveyance of three hundred acres of land and also certain property located at Mason City, Iowa. The plaintiffs' petition was dismissed, and they ap-peal.— *Affirmed.*

*F. A. Kirschman* and *Cliggett, Rule & Keeler,* for ap-pellants.

*R. K. Welch* and *Glass, McConlogue & Witwer,* for appellee.

LADD, J.— Richard Dean died October 23, 1902, leav-ing the defendant, his widow, surviving him and also the plaintiffs, Frank and Arthur Dean, his only children by a former wife. He had married defendant January 12, 1899, two months subsequent to the burial of his first wife. He

conveyed to her three hundred acres of land, known as the
"Stinson Place," situated in Cerro Gordo county and his
residence property in Mason City, December 13, 1899, and,
in this action, plaintiffs ask that the deeds be set aside on
the ground that they were procured through undue influence
exercised by the grantee therein.   It is not claimed that the
deceased was incapable because of mental unsoundness to
execute the conveyances, for if so, the deeds to plaintiffs and
the will hereinafter mentioned might be invalidated on the
same ground.   The record is without evidence that she ex-
erted any influence whatever to induce him to convey the
property.   She may have found fault with the party with
whom the deeds were left for a time for advising deceased
that to deliver and record them was unnecessary, but this did
not indicate their procurement at her instance.   Mere opin-
ions as to her relations with her husband were of no conse-
quence, and no instances or particular circumstances proven
show that he yielded to her will in any business or other
transaction, nor that she did or said anything to alienate him
from his children.

Counsel contend, however, that because of his mental
and physical condition he was so in the care and control of
his wife that the law raises a presumption that any trans-
action between them was of her procurement, and that there-
fore the burden is upon her to affirmatively prove that the
conveyances were the voluntary acts of deceased.   Conced-
ing this to be the rule, if the facts were as stated, the record
fails to show that prior to the delivery of the deeds he was
helpless either physically or mentally.   On the contrary, he
transacted all of his business himself, and there was a large
volume of it, with discretion and sagacity.   Not an instance
is disclosed in this voluminous record, requiring personal at-
tention, in which he did not act with discretion.   Notwith-
standing this, many of his old neighbors and friends ex-
pressed the opinion that he was of unsound mind, though
most of them evidently intended to be understood as saying

merely that his mental faculties were somewhat impaired by old age. Briefly, the circumstances said to indicate mental weakness may be referred to. He was born in England in 1822, and settled on a farm near Rockford, Ill., in 1855 where he remained for thirty years. In 1885 he disposed of his property in Illinois, and acquired a farm of three hundred and twenty acres near Mason City, where he lived until the death of his first wife, November 10, 1898. His son Arthur lived with him on this farm while Frank resided on another farm nearby of the same acerage, which deceased then owned. He had been successful and was economical, and had invested his savings in farm mortgages which he had accumulated to the amount of $30,000 or $40,000.

It is not disputed but that up to 1897 he was in robust health, and was a keen and astute business man of excellent judgment. He was then seventy-five years of age and began to fail. During the years of 1898 and 1899 he disposed of a large portion or all of the farm securities and with the proceeds purchased eight hundred and eighty acres of land in Deuel county and two thousand eight hundred and eighty acres in Campbell and Walworth counties, S. D. These lands were carefully selected, and no more paid for them than they were worth. This change from investment of his means in farm mortgages to that in South Dakota lands is relied upon as one of the circumstances indicating the weakening of his intellect. As the evidence shows that there was a marked rise in values, many times greater than the interest he would have received on the loans, this is better proof of farseeing financial sagacity. The venture meant a net enhancement in value to his estate of at least $15,000. It is next said that prior to this time he was closemouthed concerning his business transactions, whereas after his South Dakota investments, he was talkative. Manifestly, he could not well discuss loans made to neighbors, while talking about the lands he had bought in South Dakota would affect no one adversely, and aided him in disposing of them. Moreover,

he had leased his farms and was giving his attention to these new investments, and would naturally talk of them. It was a repetition of his change from Illinois which had proven so profitable to him in a financial way. Nor are we ready to say that his hasty marriage should stamp him as peculiarly weak-minded. Undoubtedly it was in bad taste, and might well have been criticised by the sons of his former wife with whom he had lived fifty-two years, and by his neighbors. But yielding to the mating instinct, even under such circumstances, cannot be regarded as conclusive proof of imbecility. See *Perkins v. Perkins,* 116 Iowa, 263. Nor does the disposition made of his estate indicate want of mental capacity. Six days after his marriage he conveyed (his wife joining) to each of his sons, the farm on which each resided. Thereafter, he exchanged some South Dakota land as part consideration for the residence and farm in controversy and another farm of one hundred and sixty acres. The exchange for the farms was at considerable profit to him. The last-mentioned farm was conveyed to his son Frank in April, 1901.

In June, 1899, he conveyed five quarter sections in Campbell county to William W. Mills, a son of his wife, at a profit, for $5,000, taking a mortgage thereon for that amount and this mortgage with others amounting in all to $9,700 he assigned to his wife, January 23, 1901. Prior thereto, October 23, 1900, he had conveyed to her the remaining half section in Deuel county and on March 11, 1902, he executed a will devising to each of his sons a section of land in Campbell and Walworth counties and making them residuary legatees of his estate. One of the quarters left to Frank had been disposed of, but he had another quarter which passed to both under the will. A bequest of $500 to each of Arthur's two children was made a lien on the land left him. The household goods and stock was bequeathed to the wife, and a mortgage of $1,700 passed to the sons after payment of inconsiderable claims against the estate and the costs of

administration. Without entering into a detailed computa-
tion of values, it is sufficient to say the wife did not receive
to exceed the residence, worth about $4,500 in excess of one-
third of the estate. The parties estimate the value of the
estate to have been $100,000, and even had the design been
to leave it in equal parts the discrepancy might be attributed
to difference in judgments of value. Moreover, his corre-
spondence and declarations show that the property was dis-
tributed in pursuance of a matured design on his part and
what was done cannot be said to indicate that it was the work
of a disordered mind. That his memory became impaired
we have no doubt. He sometimes forgot for a time what he
had done the day before, and had difficulty in locating places
and remembering descriptions of his land. But nothing in
this record indicates that his memory was so poor that he
could not, and did not, attend to all his business with good
judgment. True, he sometimes referred to his wife for facts
as younger men often do, but neither this nor anything else
proven showed that he was helpless or dependent on her for
direction or care, save in his last sickness. We have referred
to the facts proven rather than the opinions of the witnesses,
for the latter are seemingly in sharp conflict. Taking into
consideration the facts relied on as a basis of the opinions of
the nonexpert witnesses and the opinions of the physicians,
we are inclined to think that the mental impairment was no
more than that attributable to advancing age. He was in
possession of his faculties though these were less vigorous
than formerly.

Without reviewing all the evidence which we have read
with great care, we are content to state our conclusions
merely, and these are: (1) That the evidence fails to show
that deceased was helpless or dependent on defendant for
care prior to his last sickness in 1902, and for this reason
no presumption arose that the conveyances were of her pro-
curement; (2) that the burden of proof was on plaintiffs to
show that the conveyances were the result of undue influence

exerted by the defendant, and (3) that the evidence fails to sustain the allegation to this effect.

The trial court did not err in dismissing plaintiffs' petition, and the decree is *affirmed*.