ICHABOB McCORD, LUTHER McCORD, MRS. MARY YEAMANS, ALEXANDER McCORD, WILLIAM McCORD and PATRICK McCORD, Appellants, v. BRADLEY McCORD, Appellee.

**Gifts:** UNDUE INFLUENCE: BURDEN OF PROOF. A donee is not re-
1  quired to show an absence of undue influence, where the donor, up to the time of his death, was in full possession of his faculties and in no way dependent upon the donee.

**Gifts:** DELIVERY. To constitute a gift there must have been an
2  actual delivery of the property.

**Limitation of actions:** RECOVERY OF PERSONAL PROPERTY. One heir
3  who knows of the claim of another to certain personal property of the estate, and of its conversion by another, cannot recover therefor after the period of limitations has run.

*Appeal from Shelby District Court.*—HON. W. R. GREEN, Judge.

THURSDAY, OCTOBER 24, 1907.

ALEXANDER McCORD died intestate July 1, 1887, leaving his widow surviving him, who died November 28, 1900,

also intestate, and five children, Ichabod, Luther, William, and Bradley McCord and Elizabeth Lynch. William died intestate January 23, 1903, leaving as his sole heirs Alexander, William and Patrick McCord, and Mary Yeamans. Elizabeth Lynch died intestate without issue March 27, 1897, and it is conceded that the parties to this action are her only heirs; so that plaintiffs, with defendant, are the sole surviving heirs of Alexander and Sybil McCord. Plaintiffs demand of the defendant an accounting for property of Alexander McCord alleged to have been in his possession at the time of his father's death, and judgment for four-fifths of the value thereof, with interest from the date of its appropriation. The defendant in his answer denied that any property of the deceased was in his possession, pleaded the statute of limitations, and alleged that laches on the part of plaintiffs should bar recovery. On hearing the petition was dismissed. Plaintiffs appeal.— *Affirmed.*

*Salinger & Korte* and *D. O. Stuart,* for appellants.

*Byers, Lockwood & Byers* and *T. R. Mockler,* for appellee.

LADD, J.— Plaintiffs and defendant are the heirs of Alexander McCord, who died in July, 1887. This action was begun in 1902, more than fourteen years after his death, and therein recovery is sought for a large amount of personal property alleged to have belonged to deceased and to have been appropriated by defendant. It appears from the evidence that in 1873 Alexander McCord, then sixty-two years of age, owned two farms, one in Grove township, known in the record as the " Grove farm," on which he lived, and the other in Douglass township, called the " Botna farm." Three sons were then at home, and to them he proposed that all work together on these farms, and that, if they would do so, he would divide all the property equally between them when he was done with it, as he had aided his daughter

Elizabeth and his son William all he intended to. Luther preferred to do for himself, and was paid $1,000 in money and value as his share of the estate. Ichabod and Bradley accepted the proposition, and faithfully assisted in carrying out their father's designs. At that time there was but two hundred and twenty-five acres in the Grove farm and four hundred and eighty in the Botna farm, and against the latter an indebtedness of $5,000. This was paid, and the acreage of each increased so that in November, 1886, Alexander conveyed to Ichabod, including the Grove farm, four hundred and sixty acres with a contract for the purchase of eighty acres, and this son had one hundred and twenty acres besides. At the same time he deeded the Botna farm, then consisting of six hundred acres, to Bradley. Some town property was also conveyed to them. A large amount of stock and farm implements had been accumulated on each place. All on the Grove farm was given to Ichabod in 1884 or 1885. What was done with that on the Botna farm? Bradley, who married in November, 1873, took up his residence in the upper story of a granary they had constructed on the Botna farm in July following, and continued to live therein until a house was erected in 1881. He had taken with him forty or fifty head of cattle, six horses and a few hogs, and thereafter some stock was driven over from the Grove farm. In 1882 Alexander, then seventy-one years of age, with his wife, moved into the house with Bradley, and continued to reside there until his death. The record is silent as to what, if any, part he took in the management of this farm after he had moved thereon, save that he insisted that the cattle of Ichabod bring as high a price as those of Bradley in 1885. In the spring of 1886 he was feeble and thereafter unable to participate in work.

The record contains no intimation, however, but that he continued in the full possession of his faculties until the end, nor does it appear that at any time prior to the alleged gift was he dependent on Bradley for care. This being so,

the burden was not cast on defendant to exculpate himself

1. Gifts: undue influence: burden of proof.

from all imputation of having exerted an undue influence to induce his father to give him the property. *Dean v. Dean,* 131 Iowa, 487. That deceased intended to give Bradley the personal property on the Botna farm admits of little or no doubt. He had given that on the Grove farm to Ichabod, and this undoubtedly was in pursuance of the original agreement to divide his estate equally between these sons. That he supposed he had given that on the Botna farm to Bradley is conclusively established by the testimony of Wood, with whom, as township assessor, the father refused to list the property in the spring of 1887, because, as he declared, it belonged to Bradley, and that the latter owned it as well as the farm. About a year previous to his death, he had told Fountain about conveying the land, and said: " This stuff on this place is all Bradley's now, and the other I gave to Ichabod." In the fall of 1886 he said to Eakers that " he had given Bradley everything he had on the place, and Ichabod what he had over on the west place." To each of the last two witnesses he related the facts concerning the settlement with Luther, and the arrangement under which Ichabod and Bradley had worked. A couple or three weeks before he died he said to Booth that he had everything fixed as he wanted it, that he did not wish the lawyers to share his earnings, and was satisfied it was so arranged. He had obligated himself to turn over all the property accumulated in his name to Ichabod and Bradley. As to such property, others had no claim on his bounty. He had given Ichabod the personal property, and, if his declarations shortly before death be accepted as true, he supposed that he had given that on the Botna farm to Bradley.

But to constitute a gift there must have been an actual delivery of the property, and the admissions of defendant tend strongly to show that this never occurred. It seems that after Alexander's death Bradley had paid his mother

$1,000, as he claims, to equalize the division of properties

2. Gifts: delivery. between him and Ichabod, and that of this there remained a balance of over $700 at her death. Luther and Ichabod met with Bradley to distribute this. A dispute arose concerning the amount, when Luther stepped out of the room, and, according to Ichabod, Bradley immediately related that after his father had executed the deed and reached the personal property he (Bradley) had said: " Father just let it remain as it is, and I will divide it up with the heirs." The story is extremely improbable, for under the agreement all the property was to be divided between the sons, and this all three of them well knew. The denial of this by Bradley is entitled to credit. The same witness testified that defendant admitted in January, 1901, that his father had left $4,000 in money, twenty-five or thirty horses, one hundred and twenty-five to one hundred and fifty head of cattle, one hundred to one hundred and twenty-five hogs, and that on January 20, 1902, several met in the office of defendant's attorneys, to effect a settlement if possible. After reciting something of what was said there, and that an attorney for plaintiffs had requested Bradley to " state what he had left in the way of property at his death," the witness was asked to go on and state how Bradley came to tell about this, and answered: " You asked him to make a statement of what property there was there. Q. What did he say? A. Well, he says $1,000 in money. Q. I have not inquired what he said about anything being left there. The question is what did he say if he said anything about what property your father left at the time of his death. My question is now what property was left there. A. Why, he said his father left certain property there, left $1,000 in money, 1,200 or 1,500 bushels of wheat, eighteen head of horses, 60 head of cattle, and he said the horses, hogs, and cattle were worth $2,500. Then the question was asked him in regard to the corn, how much there was on the place at the time father died. He said there was

7,000 bushels, but says that was my corn, that was raised on my land, and you cannot make me account for that." That he was asked the question by the attorney and answered that property was there as recited above is confirmed by the testimony of Luther and a nephew, Patrick McCord. The only explanation of this was that he did not remember of having stated what his father had left on the farm. At another time, he chided Ichabod for admitting anything, saying, if he did, they would have to divide with the heirs, and on several occasions remarked that the heirs had rested on their rights too long; if they had begun in time, they might have succeeded.

In March, 1901, in answer to a letter from Ichabod, he wrote: "Would say that I have made some inquiry about father's property. You know that father made deeds to the realty, and we was to take care of mother as long as she lived, and I was to pay $1,000.00 to her and gave my note for the same, and paid note years ago. William McCord lived three years and a half after father died, and Pat can't come in on that. He was not of age. We can hold the personal property for taking care of mother. They have all lived in the country all the time since father died. They have not made no demands on me, and fourteen years is a long time to wait to commence action. I would like to see them satisfied, and be friends. Yours Truly, B. McCord." But for this letter we should entertain grave doubt as to whether the defendant had made the admissions to his brother to which we have alluded. We should be inclined to reject the testimony of Ichabod, and say that defendant must have had reference to the property on the place rather than what his father had left when talking in the office of his attorneys.

The conduct of plaintiffs has been entirely inconsistent with their claim. For fourteen years, though on good terms and often visiting defendant, and knowing that he was in possession of the property and had converted it into money,

none of them ever mentioned to him any claim or interest

3. LIMITATION
OF ACTIONS:
recovery of
personal
property.
in the property or proceeds. Indeed, both Ichabod and Luther had borrowed money of him when, if their contention be true, he was then owing them a large amount. So, too, is defendant's conduct in proposing a method by which the property might be held inconsistent with his claim that it was given to and of right belonged to him. But he has been consistent in his contention that the plaintiffs have slept too long on their rights, and are now barred from recovery. The plaintiffs insist that during all these years they supposed themselves entitled to share in this property. If so, they have seen the defendant convert it to his own use without a murmur of objection, and not sought relief until after the expiration of the period of the statute of limitations. The evidence shows that the corn and oats left on the farm at the time of Alexander's death were fed to the stock. What became of the wheat does not appear, save that all the property then remaining, including stock and implements, was sold at public auction in October, 1893. Luther, Ichabod, and Mrs. Lynch were at this sale, and personally knew that it completed the disposition of all property on the farm when Alexander died, and that Bradley was appropriating the proceeds to his own use. Indeed, he informed Ichabod he was going to town and take life easy. Patrick McCord knew of the sale, but did not attend. As he and the other three children of William lived but a few miles distant in an adjacent township, and sale bills were posted throughout the neighborhood, they must have been aware of it. Bradley's testimony, to the effect that they knew of his removal to Harlan, is undisputed. Moreover, the widow and children of Alexander McCord joined in the execution of a release of a mortgage to the deceased in 1889, and another at about the same time with knowledge that both were being paid to defendant. Whatever property deceased left was reduced to money and appropriated by Bradley McCord

prior to January 1, 1894. If he was a tenant in common or a trustee for the other heirs, his tenancy or trusteeship was repudiated by the appropriation of subject-matter of the tenancy or trust at least six years before any demand was made and seven years before suit was brought.

The case differs from *Murphy v. Murphy,* 80 Iowa, 740. There the defendant took charge of the property under circumstances indicating that he was managing it for the benefit of those to whom it belonged. Here the defendant treated the property from the time of his father's death as his own, and the conduct of the other children was in harmony with his claim. Without any suggestion of claim to or interest therein on their part, he fed or disposed of the grain, mingled the stock with other that he had, kept all on and fed them from the products of his own farm, sold whenever ready for the market, collected the mortgages with their assistance, and pocketed the proceeds with their knowledge, and finally disposed of all property on the premises and moved away. During all this time he dealt therewith as his own, and this was well known to the other heirs. How he could have asserted his claim of ownership more unequivocally against them and all others without express verbal notice we are unable to comprehend. The circumstances are such as to leave no doubt of the knowledge by all the heirs of his claim as early as 1894, though some of them testify otherwise, and this finds confirmation in the fact that Luther and Ichabod subsequently borrowed money of him, a circumstance unlikely to happen had he been indebted to them. Indeed, the record strongly indicates that all regarded the property Bradley McCord's up to the time of the controversy over Mrs. McCord's estate in 1901.

Conceding otherwise, and as they contend, however, their cause of action, if any they had, accrued more than five years before this suit was begun, and on this ground the decree, dismissing their petition, must be and it is *affirmed.*