HUGH SULLIVAN and DASIE V. ORTON and JOHN M. ORTON, Minors, by their next Friend, WILLIAM ORTON, Appellees, v. KITTIE KENNEY and E. N. KENNEY, Appellants.

Actions: MISJOINDER OF LEGAL AND EQUITABLE CAUSES: WAIVER OF ERROR.   Where an independent action is subsequently brought upon certain counts of a petition embracing also equitable causes of action against the same defendants, and by stipulation the cases

are consolidated and no motion is made to transfer the legal causes to the law docket for trial, any error in refusing to strike the counts from the original petition because of a misjoinder of legal and equitable actions was waived.

**Wills:** PROBATE OF FOREIGN WILLS: AUTHENTICATION OF PROCEEDINGS: OBJECTIONS: WAIVER. The proponent of a foreign will by pleading over and attempting to meet objections to the probate in this state, on the ground that the proceedings in the foreign court were not properly authenticated, waives any error in the ruling sustaining the objection.

**Evidence:** AUTHENTICATION OF FOREIGN JUDICIAL PROCEEDINGS. The authentication of judicial proceedings in a foreign state need not conform to the federal statute prescribing the requisites of such proof, provided the same is in conformity with the state law; which, however, can not make additional requirements but may provide for less proof than the federal statute requires.

**Wills:** PROBATE OF FOREIGN WILL: AUTHENTICATION. The authentication of the probate of a will in a foreign state consisting of a copy of the will, the record of its probate, attestation by the clerk of court and the certificate of the judge that his attestation was in due form, is sufficient to authorize admission of the will to probate in this state as a foreign will.

**Same:** JURISDICTION. Mental capacity and undue influence are questions which do not go directly to the jurisdiction of a foreign court to probate a will, but the testator's mental capacity may be considered on the question of his change of domicile as bearing upon the jurisdiction.

**Same.** A foreign judgment admitting a will to probate may be attacked for want of jurisdiction although the court rendering the judgment expressly found that it had jurisdiction.

**Same:** PROBATE: PRODUCTION OF ORIGINAL WILL. Where it is claimed that a will is entitled to probate as a domestic will the original instrument must be produced.

**Fraudulent conveyances:** TRUST AND CONFIDENCE: UNDUE INFLUENCE: PRESUMPTION: BURDEN OF PROOF. Where a relation of trust and confidence is shown and it appears that the stronger and controlling mind has obtained the conveyence of property or acquired other pecuniary advantage, it will be presumed that such person exercised an undue influence to his own advantage; and the transaction will be set aside by a court of equity unless the beneficiary establishes by abundant proof that the transaction was free, fair and in the utmost good faith.

**Wills:** PROBATE: BURDEN OF PROOF. In a proceeding to probate a will made and probated in a foreign state the burden is upon the contestants to show that the foreign court had no jurisdiction; and this involves an affirmative showing that the testator was not domiciled within the jurisdiction of the foreign court at the time of his death, where that question is in issue.

**Fraudulent conveyancees:** UNDUE INFLUENCE: EVIDENCE. In this proceeding to set aside conveyances of land from an aged father to his daughter, and to recover money turned over to her, the evidence is reviewed and held to show that the father was possessed of insane delusions and hallucinations materially affecting his mind, and that by reason of such fact the defendants were able to and did exercise an undue influence over the grantor in procuring the conveyance, and the transfer of the money.

**Wills:** UNDUE INFLUENCE. The evidence in this action is also held to show that a will of the grantor leaving his entire estate to a daughter, to the exclusion of his other heirs, was obtained by fraud and undue influence.

**Sale of real property situate in a foreign state:** JURISDICTION OF PROCEEDS. Although the court has no jurisdiction to partition land situated in another state it does have jurisdiction over actions *in personam,* and may entertain actions to secure a conveyance of the land or declare a trust therein. So that where lands in another state were sold pending actions involving the right thereto, the proceeds arising from the sale partake of the nature of real estate and may be followed into the hands of the seller and disposed of by a court having jurisdiction of his person.

*Appeal from Jasper District Court.*—HON. BYRON W. PRESTON, Judge.

TUESDAY, MAY 10, 1910.

THREE proceedings instituted in the district court of Jasper County were consolidated and tried as one in the lower court. One was originally an action in equity brought by plaintiff against the defendants to set aside deeds to quiet title to the land conveyed thereby, for partition, an accounting, and other equitable relief. Another was an action at law brought by Hugh S. Sullivan, as

administrator of the estate of John Sullivan, to recover
from defendants something more than $7,600, which it
is claimed defendant fraudulently procured from the in-
testate before his death. Another was a proceeding
instituted by petition filed · by defendant Kittie Kenney
for the probate of the will of John Sullivan, based upon
the original probate thereof in the state of California.
Objections were filed by plaintiffs to the probate of this
will. After issues joined in each of these cases a stipula-
tion was entered into, whereby they were tried to the
court at the same time and upon the same testimony, so
far as applicable. Upon trial to the court the objections
to the probate of the will were sustained, and judgments
and decrees were entered for the plaintiffs in the other
two cases substantially as prayed in the petitions. Defend-
ants Kenney and Kenney appeal. *Affirmed.*

*Clark & Hutchinson, McClain & Campbell,* and *Cle-
ments & Arnold,* for appellants.

*E. J. Salmon, E. M. S. McLaughlin,* and *A. H. Brous,*
for appellees.

DEEMER, C. J.—John Sullivan died in Ontario, Cal.,
October 3, 1907, at the age of eighty years. He was
the father of three children, to wit, Hugh Sullivan, plain-
tiff, a son, Kittie Kenney, defendant, a daughter, and a
daughter deceased at the time of his death, who left sur-
viving two minor children, Daisie V. and John M. Orton,
plaintiffs herein. Defendant E. N. Kenney is the husband
of Kittie Kenney. For many years prior to his death,
if not at the time thereof, John Sullivan had been a
resident of Jasper County, in this state. By habits of
industry and thrift he became the owner of five hundred
and seventy-two acres of land in this county, most of which
was purchased during the years 1866 and 1867. Some

five or six years prior to his death he purchased an orange ranch in the state of California. In January of the year 1906 Sullivan was stricken with a severe illness, which lasted several months, and from which he never entirely recovered. At that time defendants were living in California, and, being advised of the father's sickness, Mrs. Kenney came to Iowa in the month of April of that year, and remained something like three weeks, when she returned to California. She again returned to Iowa in September of that year; her husband accompanying her on this trip. At this time John Sullivan was residing with his son Hugh on one hundred and sixty acres of land near Prairie City, in Jasper County, which was called the home farm. At that time the most friendly and kindly relations existed between the parties who are engaged in this controversy, and, so far as known, between John Sullivan and all of his relatives. On October 25, 1906, John Sullivan executed a warranty deed to his daughter, Kittie Kenney, of the orange ranch in California; the deed reciting a consideration of $15,000, although as a matter of fact nothing was paid. On October 22, 1906, the defendants and John Sullivan appeared at a bank in Prairie City, and Mrs. Kenney told the cashier that her father wished to deposit $7,000 to the credit of herself and husband. Six $1,000 bills and two checks of $500 each were then taken from the pocket of John Sullivan, delivered to the banker, and $7,000 placed upon the books of the bank to the credit of the defendants. Several days thereafter Hugh Sullivan, plaintiff, learned of the transaction at the bank, and he immediately filed a petition for the appointment of a guardian of his father, whom he claimed was then of unsound mind. Hugh was thereupon appointed temporary guardian of his father and of his property. Notice of the application was then served upon John Sullivan. As soon as the notice was served, defendant Kittie Kenney informed her brother Hugh that the

father would not return to Hugh's home, and she thereupon took her father to a private boarding house in Prairie City, and kept him there for four or five weeks. He was then taken to a farm where he lived for a few weeks, and until just before the time set for the hearing of the guardianship proceedings, when he was taken to a boarding house in the city of Newton. Negotiations were entered into between the parties for the settlement and dismissal of the guardianship proceedings, and it is claimed that at the urgent solicitation of the defendants and upon their promise to return all the money and property which they had received from John Sullivan, and to take him back to Hugh's home, the guardianship proceedings were dismissed. Within a very short time after the dismissal of these proceedings John Sullivan, in consideration of mutual love and affection, made a deed to defendant Kittie Kenney for the five hundred and seventy-two acres of land in Jasper County. This deed was executed December 8, 1906, but was not filed for record until the 24th. It is claimed that, as soon as this deed was executed, Kittie Kenney and her husband surreptitiously took the old man from the Ellers' boarding house to the private home of one R. C. Daly in Newton, kept him there over night, and stealthily took an early train the next morning for California, taking John Sullivan with them, and keeping him there in close custody until his death. Within a day or two after the recording of this deed, Hugh Sullivan's attorney discovered the fact, and at once reported the matter to Hugh, and thereupon another action was instituted in the Jasper County district court for the appointment of a guardian for the person and property of John Sullivan. Petition being filed, Hugh Sullivan was appointed temporary guardian and duly qualified as such. He was also authorized as such guardian to institute the necessary proceedings to recover the property which testator had deeded and transferred to defendants. He almost imme-

diately brought the first action named in the statement of this case to set aside the conveyance of the Jasper County land. Notice of the guardianship proceedings was personally served upon John Sullivan in the state of California, and of the other action upon the defendants in the same state. These two actions were continued or postponed for one reason or another, generally upon defendants' motion until the death of John Sullivan. Hugh had no notice of his father's death until informed by some stranger that the body was enroute from California to Prairie City for burial. He thereupon assisted in arranging for the funeral, and, after the interment, he was appointed administrator of the father's estate by the district court of Jasper County, and on October 10th brought action in the same county against the defendants for the money which it is claimed was fraudulently procured by defendants from the father before his death. In each of these actions it was claimed that John Sullivan was unsound of mind and incapable of making deeds or transferring his property, and that the deeds and transfers hitherto mentioned were obtained by the defendants through fraud and undue influence practiced by them upon the deceased, and they asked that the deeds and transfers be set aside, that judgment be rendered for the amount of personal property received by defendants from the deceased, that partition be had of all the real estate whether in this state or in California, that defendants make an accounting of the rents and profits of all the real estate, and for general equitable relief. And the administrator in his action asked to recover all the money and personal property turned over to the defendants or either of them by the deceased during his lifetime.

Defendants denied the alleged mental incapacity of Sullivan, and also specifically denied all fraud and undue influence. Pending the hearing of these actions Kittie Kenney, as proponent, filed in the district court of Jasper

County a petition for the admission to probate in said court of an alleged foreign will of John Sullivan, bearing date July 10, 1907, which it is claimed was duly admitted to probate by the proper court of California. This application was made under section 3294 of the Code. Plaintiffs herein filed objections to the probate thereof, and these objections were sustained and exception taken. Leave was given to proponent to amend. This she did, and plaintiffs again filed objections and motion to strike. In this situation the parties filed the following stipulation: "It is hereby stipulated that cases Nos. 99 and 7,380 be, and they are, consolidated with this action, to be tried at the same time and upon the same evidence, so far as material; and it is agreed that the same were thus tried to the court."

It is contended that from the time of John Sullivan's sickness in January, 1906, down to the time of his death, he was unsound of mind and mentally incapable of doing any business; that the transfers of money and property made by him to defendants were fraudulent both in fact and in law, and that they were compassed and brought about by and through the fraud and undue influence of the defendants; that defendants then had charge of John Sullivan, who was weak of mind and body, and susceptible to their influence; that they gained his confidence, and were in such relations to him that they could not take conveyances or transfers from him except upon a showing of good faith and fair dealing. It is also claimed that John Sullivan did not go to California of his own volition; that he never changed his residence but was always domiciled in Jasper County; that he was taken in an almost helpless condition and surreptitiously by defendants from Iowa to California; and that he never gained a legal residence or domicile in the latter state. This testimony was introduced to show that the probate court of California had no jurisdiction to probate the alleged will of

John Sullivan. It is also contended that at the time of the making of the alleged will Sullivan was unsound of mind and incapable of making such an instrument, and that it too was procured by the fraud and undue influence of the defendants. The lower court sustained practically all of plaintiff's contentions, and in a general way granted the prayers of their petitions. It also refused to probate the foreign will. It did not order the partition of the California property, but, it appearing that the ranch had been sold after action brought and before trial, it rendered judgment for two-thirds of the proceeds thereof against the defendants, they being entitled to one-third thereof, according to plaintiffs' theory, because of the kinship of Mrs. Kenney.

Upon the fact questions presented a large amount of testimony was taken pro and con, and, as usual in such cases, it is very conflicting and some of it quite unsatisfactory. It is impossible to reconcile it on the theory that all of the witnesses have spoken the truth, and, to get at the real facts, we shall be obliged to use the rules and tests resorted to by courts and judges for arriving at a correct solution of the issues presented. Some interlocutory rulings are complained of, and there is a wide difference of opinion among counsel regarding some of the legal propositions involved. We shall first dispose of some of the preliminary rulings of the trial court.

I. Appellants filed a motion to strike certain counts from plaintiff's original petition. These counts were based upon the transfer of the money by John Sullivan to defendants in this state as before indicated. It is claimed that these were improperly joined with the equitable action to set aside the conveyances of the land; one action being at law and the other in equity. Again, it is said that an action to recover money can not be joined with an action of partition. For the purposes of the case we

1. ACTIONS: misjoinder of legal and equitable causes: waiver of error.

may assume that this motion should have been sustained, and that the ruling of the trial court thereon was erroneous. But, as thereafter an action to recover this identical money was brought by the administrator of Sullivan's estate, which action was consolidated with the others and tried to the court by agreement, defendants waived the error, and can not be heard to complain thereof. At no time did defendants move to transfer this case or the issues relating to the personal property to the law docket for trial, and, as all claim to the personalty was waived save in so far as the administrator was concerned, defendants are in no position to complain of the forum in which the case was heard. *Browne v. Hickie,* 68 Iowa, 330; *Scribner v. Taggart,* 123 Iowa, 321.

II. The trial court denied the probate of the foreign will largely, if not wholly, because the proceedings of the court of California were not properly authenticated. Objections were presented to the first petition on these general grounds and they were held sufficient. Proponent was then given time to amend the certificates, etc., and this she did. Thereupon objections were again filed, and the case was submitted, as we understand it, with these objections on file, but undisposed of. Exception was taken to the first ruling; but proponent pleaded over and attempted to meet these objections. Under previous holdings this would seem to be a waiver of the error if there was one. *Smith v. Powell,* 55 Iowa, 215; *Frick v. Kabaker,* 116 Iowa, 494; *Geiser Mfg. Co. v. Krogman,* 111 Iowa, 503; *Frum v. Kenney,* 109 Iowa, 393; *Redhead v. Bank,* 123 Iowa, 336.

2. WILLS: probate of foreign wills: authentication of proceedings: objections: waiver.

To properly decide the question here presented, we must have before us some state and federal statutes. Section 3294 of the Code reads as follows:

A will probated in any other state or county shall

be admitted to probate in this state without the notice required in the case of domestic wills, on the production of a copy thereof and of the original record of probate, authenticated by the attestation of the clerk of the court in which such probation was made, or, if there be no clerk, by the attestation of the judge thereof, and the seal of office of such officers, if they have a seal.

Section 3296 reads in this wise:

Wills, foreign or domestic, shall not be carried into effect until admitted to probate as hereinbefore provided, and such probate shall be conclusive as to the due execution thereof, until set aside by an original or appellate proceeding.

Section 4645 of the Code provides:

That (a judicial record) of another state may be proved by the attestation of the clerk and the seal of the court annexed, if there be a seal, together with a certificate of a judge, chief justice or presiding magistrate that the attestation is in due form of law.

And section 905 of the Revised Statutes of the United States reads as follows:

The acts of the Legislature of any state or territory, or of any country subject to the jurisdiction of the United States, shall be authenticated by having the seals of such state, territory or country affixed thereto. The records and judicial proceedings of the courts of any state or territory, or of any such country, shall be proved or admitted in any other court within the United States, by the attestation of the clerk, and the seal of the court annexed, if there be a seal, together with a certificate of the judge, chief justice, or presiding magistrate, that the said attestation is in due form. And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the state from which they are taken.

It is not necessary that the proof correspond with the federal statute provided the state is content with some other showing. See, *Willock v. Wilson*, 178 Mass. 68 (59 N. E. 757); *Wells v. Davis*, 105 N. Y. 670 (12 N. E. 42); *Hewit v. Bank*, 64 Neb. 463 (90 N. W. 250, 92 N. W. 741); *Title Co. v. Potteries Co.*, 56 N. J. Eq. 441 (38 Atl. 422.) While the state can not add additional requirement, it may provide for less. *Ritchie v. Carpenter*, 2 Wash. St. 512 (28 Pac. 380, 26 Am. St. Rep. 877).

3. EVIDENCE: authentication of foreign judicial proceeding.

For appellant it is insisted that the record was properly authenticated; that, under the rule requiring full faith and credit to be given the probate of the foreign will, that probate became absolute and can not be challenged upon any ground, particularly because of the mental unsoundness of the testator or of undue influence. It is also argued that, as the California court found expressly that it had jurisdiction, and that John Sullivan was a resident of California and domiciled there, these questions can not now be considered, but are concluded by the findings. Relying, then, upon this will, which left plaintiffs nothing, they say that the case was wrongly decided. As much depends upon the authentication of the record of the California courts, we here set out the authentications thereof. As first presented they read as follows:

State of California, County of San Bernardino—ss.: I, Charles Post, county clerk and ex officio clerk of the superior court of said county, do hereby certify the foregoing to be full, true, and correct copies, respectively, of the petition of Kitty Sullivan Kenney for letters testamentary; order, by clerk, fixing time; affidavit of publication of notice of probate of will; certificate of proof of will and the facts found; will of John Sullivan, deceased; order admitting will to probate; letters testamentary, issued to Kitty Sullivan Kenney, in the matter of the estate of John Sullivan, deceased; and I further certify

that I am the legal keeper of all of said original documents, and that I have carefully compared all of said copies with the originals thereof, which said originals are on file in my office. It witness whereof, I have hereunto set my hand and affixed my official seal this 4th day of December, 1907. Charles Post, Clerk. [Seal of Superior Court, San Bernardino County, Cal.]

I, Frank F. Oster, presiding judge of the superior court of the county of San Bernardino, state of California, hereby certify that Charles Post, whose genuine signature is annexed to the above certificate, was at the date thereof the clerk of said court, and that the official acts and doings of said Charles Post as said clerk are entitled to full faith and credit, and that the foregoing attestation of said clerk is in due form, and that said clerk is the legal keeper of the documents referred to in said certificate. Witness my hand and the seal of said court this 4th day of December, 1907. Frank F. Oster, Judge of the Superior Court. [Seal of Superior Court, San Bernardino County, Cal.]

State of California, County of San Bernardino—ss. I, Charles Post, county clerk and ex officio clerk of the superior court of said county, do hereby certify that Frank F. Oster, whose genuine signature is subscribed to the last foregoing certificate, was at the date thereof, and now is, the presiding judge of said superior court, and is duly commissioned and qualified. In witness whereof, I have hereunto set my hand and affixed my official seal this 4th day of December, 1907. Charles Post, Clerk. [Seal of Superior Court, San Bernardino County, Cal.]

The amended certificate reads thus:

State of California, County of San Bernardino—ss.: I, Charles Post, hereby certify that I am the duly elected, qualified and acting clerk of the superior court of San Bernardino County, California. That the superior court of San Bernardino County, California, under the laws of the state of California, is the court of probate, and has jurisdiction of the probate of wills and the settlement of estates in the state of California. That hereto attached is a full, true, and complete copy of the last will and testament

of John Sullivan, deceased, and also a full, true, and complete copy of the original record of the probate of said will, as they appear in the office of the clerk of the superior court of San Bernardino County, California. I hereby further certify that the original will, a true copy of which is hereto attached, and the original record of probate, true copies of which are hereto attached, are now on file in my office, the same being the office of the superior court in and for San Bernardino County, California. And I further certify that said will and the probation thereof was had in the superior court of San Bernardino County, California. I hereby further certify that F. F. Oster is the duly elected, qualified and acting judge of the superior court of San Bernardino County, California. Charles Post, Clerk of the Superior Court of San Bernardino County, California. [Seal of the Superior Court of San Bernardino County, California.]

Attached to the foregoing is the following certificate of presiding judge:

State of California, County of San Bernardino, ss.: I, F. F. Oster, hereby certify that I am the duly elected, qualified, and acting judge of the superior court in and for San Bernardino County, California. That the superior court of California has original, full, and complete jurisdiction of all matters in probate, including the probate of wills, and that the superior court of San Bernardino County, California, has original, full, and complete jurisdiction of all probate matter in San Bernardino County, California, including the probate of wills and had original full and complete jurisdiction to probate the will of John Sullivan, deceased. That the clerk of the superior court of San Bernardino County, California, has charge, in his official capacity, of all original wills and all original records of all probate matters and proceedings. And I further certify that Charles Post is the duly elected, qualified, and acting clerk of the superior court of San Bernardino County, California, and that the seal attached is the seal of said superior court of San Bernardino County, California. Frank F. Oster, Judge of the Superior Court of San Bernardino County, Cal. [Seal of the Superior Court of San Bernardino County, California.]

*In re will of Margaret J. Capper,* 85 Iowa, 87, it is said: "Under the statute, it is required, in order that a foreign will be admitted to probate in this state, first,
that a copy of the will be produced; second, that a copy of the original record of probate be produced; third, that both be authenticated by the attestation of the clerk of the court in which probation was made; fourth, that the seal of the office or officer be attached, if they have a seal; fifth, that, if there be no clerk, authentication must be made by the attestation of the judge." Tried by this standard it seems to us that the requirements of the statute (Code, section 3294) and of the law as announced in the foregoing opinion were fully met, 'and that the foreign will should have been admitted to probate here unless it be, as contended by appellees, that the California court did not have jurisdiction to probate the will. It is well to state in this connection that the will itself was not offered for probate in this state; hence we have nothing to do with the question as to whether or not it should have been probated as a domestic will.

*4. WILLS: probate of foreign will: authentication.*

It is contended for appellants that, as the California court assumed jurisdiction and expressly found that it had it by recitals in the order of probate, this finding
was and is conclusive, and that it is not permissible to prove, when attempt is made to probate the instrument as a foreign will, that the court admitting it to probate had no jurisdiction of the matter either because the testator was incompetent to make a will, had been unduly influenced in the making thereof, or was not, when he died, domiciled in the state where his will was probated. Mental incapacity or undue influence do not, of course, go directly to the question of jurisdiction. His soundness of mind may, however, be considered upon the question of change of domicile, and is often of supreme and vital importance. To defeat this jurisdiction of the

*5. SAME: jurisdiction.*

California court, it must be shown that testator, Sullivan, was not legally domiciled in California at the time of his death.

Going now to the main legal proposition here involved, it will be found that a number of courts sustain the views expressed for appellant and hold that a foreign judgment cannot be attacked for want of jurisdiction where the foreign court expressly finds that jurisdiction does exist. But that is not the rule in this state, nor is it the one sustained by the greater weight of authority. *Kline v. Kline,* 57 Iowa, 386; *In re Williams' Estate,* 130 Iowa, 553; *In re King,* 105 Iowa, 320; *Neff v. Beauchamp,* 74 Iowa, 92; *Cooley v. Barker,* 122 Iowa, 440; *Pollard v. Baldwin,* 22 Iowa, 328; *State v. Fleak,* 54 Iowa, 429; *O'Rourke v. Railroad,* 55 Iowa, 332; *Harshey v. Blackmarr,* 20 Iowa, 161. See, also, *Scripps v. Durfee,* 131 Mich. 265 (90 N. W. 1061, 100 Am. St. Rep. 614); *Pennywit v. Foote,* 27 Ohio St. 600 (22 Am. Rep. 351); *Dunstan v. Higgins,* 138 N. Y. 70 (33 N. E. 729, 20 L. R. A. 668, 34 Am. St. Rep. 431), and note. The will itself was not, as we understand it, offered for original probate as a domestic will or as a foreign will offered for probate, because of the presence of property in this jurisdiction, so that with these questions we have nothing to do. Appellees' counsel say, however, that, even had it been so offered, it should not be admitted to probate for the reason that, when executed, testator was incompetent mentally to make it, and for the further reason that it was procured by fraud and undue influence. As to these matters of fact, we shall have more to say hereafter.

That the original will must be produced for probate if claim is made that it is entitled to probate as a domestic will, see *Bowen v. Johnson,* 5 R. I. 112 (73 Am. Dec. 49). Appellees claim that the California court was without jurisdiction, for the reason that John Sullivan was

*6. SAME.*

not domiciled in California at the time of his death;
that he did not, when he moved to Cali-

*7. SAME: probate: production of original will.* fornia or was taken there, have sufficient
mental capacity to choose his domicile;
that he did not go to California or remain there with
the intention of making that place his home; and that
at the time of the making of the will he was unsound
of mind, and that the will was procured through fraud
and undue influence.

Having now disposed of the primary legal questions
we are brought down to the propositions of fact upon which
the decision must turn.    Appellees contend that the deeds
to the California and the Iowa lands and

*8. FRAUDULENT CONVEYANCES: trust and confidence: undue influence: presumption: burden of proof.* the transfer of the personal property, money,
etc., were invalid and of no effect because
of the mental incapacity of the grantor,
John Sullivan, and for the further reason
that these gifts, conveyances, and transfers were procured
through fraud and by reason of undue influence brought
to bear upon said Sullivan by the defendants in this case.
As a legal proposition, appellees contend that as defendants
occupied a confidential relation to deceased, and during
that time received conveyances of his entire property, these
conveyances are presumptively fraudulent.    They rely upon
*Ikerd v. Beavers,* 106 Ind. 483 (7 N. E. 326); *Fishburne
v. Ferguson,* 84 Va. 87 (4 S. E. 575); *Ross v. Conway,*
92 Cal. 632 (28 Pac. 785.)    In the latter case it is said:

The rule is inflexible that no one who holds a con-
fidential relation towards another shall take advantage of
that relation in favor of himself, or deal with the other
upon the terms of his own making, that in every such
transaction between persons standing in that relation the
law will presume that he who held an influence over the
other exercised it unduly to his own advantage; or, in
the words of Lord Langdale, in *Casborne v. Barsham,* 2
Beaver, 78, the inequality between the transacting parties
is so great 'that, without proof of the exercise of power

beyond that which may be inferred from the nature of the transaction itself, this court will impute an exercise of undue influence; that the transaction will not be upheld unless it shall be shown that such other had independent advice, and that his act was not only the result of his own volition, but that he both understood the act he was doing and comprehended its result and effect.' This rule finds its application with peculiar force in a case where the effect of the transaction is to divest an estate from those who, by the ties of nature, would be its natural recipients, to the person through whose influence the diversion is made.

See, also, *Spargur v. Hall,* 62 Iowa, 498. From this last case we quote as follows:

An important consideration in determining this case is the relation which is shown to have existed between Mary Spargur and her daughter, the defendant. The relation of confidence and trust reposed in the defendant by her mother is clearly shown by the fact that she took her daughter into her home, and relied upon her as her helper and support in her old age and infirmity. Contracts made between persons sustaining these relations of trust and confidence, where it appears that the stronger and controlling mind has obtained a conveyance of property or an obligation to pay money, are jealously watched and guarded by courts of equity, and set aside, unless the beneficiary shows the *bona fides* of the transaction. Keer on Fraud and Mistake, 150-152; *Leighton v. Orr,* 44 Iowa, 679; *Tucke v. Buchholz,* 43 Iowa, 415.

Reference is also made to *Paulus v. Reed,* 121 Iowa, 227; *Schneider v. Schneider,* 125 Iowa, 1; *Fitch v. Reiser,* 79 Iowa, 34, and *Earhart v. Holmes,* 97 Iowa, 649, for an announcement of the same proposition. We also quote the following from *Mott v. Mott,* 49 N. J. Eq. 199 (22 Atl. 1000):

With reference to transactions between parent and child, the law presumes that the influence of the parent

over the child during the tender years of infancy is so controlling that it regards transfers from the child to the parent on arriving at majority, or immediately thereafter, as having been made under the influence of overweening confidence. As the child matures, and acquires experience and independence, the presumption weakens, and at last ceases. As the parent, however, advances in years, the dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks with confidence to a son or daughter for advice and protection. The parent becomes the child 'with the same dependence, overweening confidence, and implicit acquiescence, which had made the other, in infancy, the willing instrument of a parent's desires. *Highberger v. Stiffler,* 21 Md. 338 (83 Am. Dec. 593); *Martin v. Martin,* 1 Heisk (Tenn.) 653; *Brice v. Brice,* 5 Barb. (N. Y.) 533; *Comstock v. Comstock,* 57 Barb. (N. Y.) 453; *Whelan v. Whelan,* 3 Cow. (N. Y.) 537. If, under such circumstances, a son obtains a conveyance from a parent, this court will not permit it to stand unless such son establishes by abundant proof that the contract was not only free, but fair, and made with the utmost good faith.

While not absolutely controlling, this rule as to presumptions and the burden of proof seems to be well established. But appellants insist that it does not apply to the instant case, for the reason that the record does not disclose such a situation as warrants it.

Counsel contend that, under the facts, the burden was upon plaintiff to show mental incapacity, fraud, or undue influence. They further contend that, under the record, the burden was upon appellees to show that testator was not domiciled in California at the time he died, and that the will should not have been admitted to probate because of mental incapacity and undue influence. While appellees insist that as testator's last domicile is proved to have been in Jasper County, defendants have the burden of proving that testator changed it to California before he died. In

9. WILLS: probate: burden of proof.

this connection we may say that, as the will was probated in California, the burden is upon appellees to show that the court admitting it to probate was without jurisdiction, and this involves an affirmative showing that testator was not domiciled in California when he died. Here we may also state that it is strenuously contended for appellants that the Jasper County court was without jurisdiction to do anything with the California real estate. As to this, more hereafter.·

There can be no doubt that early in the year 1906 John Sullivan had a very severe spell of sickness which left him quite weak mentally and physically, and it is also admitted that, before he recovered from that illness, if he ever did, and while his daughter and her husband, defendants herein, were in Iowa, deceased made a conveyance of his California land to the daughter, and that a few days prior thereto he transferred to defendant E. N. Kenney, and there was placed to his (Kenney's) credit in a bank, something like $7,000. Knowledge of the bank transaction having been brought home to Hugh Sullivan, he immediately commenced guardianship proceedings hereinbefore referred to. The transfer of the money started the controversy between the children of the deceased which finally culminated in these actions in court. By agreement of defendants and their attorneys it was finally arranged that Hugh Sullivan would dismiss the guardianship proceedings and defendants agreed to turn back to John Sullivan the money they had received from him. The dismissal was thereupon entered, but neither the lands nor the money was returned to John Sullivan; on the contrary and within a very short time after the dismissal, defendants secured a conveyance from John Sullivan of the five hundred and seventy-two acres of land in Jasper County in consideration of natural love and affection, which conveyance was withheld from record until December

10. FRAUDULENT CONVEYANCES: undue influence: evidence.

24, 1906. On the day when the deed to the Jasper County land was made and as a part of the same transaction defendant Kittie Kenney signed the following contract:

Contract made and entered into by and between John Sullivan and Kittie Kenney, his daughter, this 8th day of December, 1906. Whereas, said John Sullivan has this day given and conveyed to his said daughter about five hundred and seventy-two acres of land located in the township of Des Moines, Fairview and Mound Prairie, in Jasper County, Iowa, now this certifies, that it was the intention of said John Sullivan in said conveyance to reserve the income from said land during his lifetime, and the said Kittie Kenney hereby agrees that she will annually hereafter on the 31st of December of each year, commencing on the 31st day of December, 1907, pay over to her said father, the said John Sullivan, all sums that she shall have received from said lands as rental therefor for the previous year, less the actual expense of looking after renting said lands and collecting such rentals.

This contract was not acknowledged, nor was it recorded, and it first appeared when produced by Mrs. Kenney on the trial of this case. Before the recording of this deed, defendants took John Sullivan from the place where he was then boarding in Newton to a private house, kept him there until the next morning, and then took him in a wheel chair to the depot, where they boarded a train, and took him to their home in California, where he lived until his death. In California he was constantly attended by trained nurses until his death, and while there he transacted no business on his own account. Almost immediately upon the recording of this last deed, Hugh Sullivan commenced the second guardianship proceedings which we have heretofore referred to. Although without any property to dispose of, it is claimed that John Sullivan made the will which was admitted to probate in California. This will purports to have been executed on

July 10, 1907, and testator died on October 3d of the same year. It is admitted that testator had a paralytic stroke on July 30, 1907, and that thereafter he was a physical and mental wreck, having no capacity to make a will or contract. Indeed, the witnesses practically agree that after July 30th, and until his death in October, 1907, testator was in a state of idiotic dementia. The second guardianship proceedings were never brought to trial, largely, as before stated, because of continuances obtained for and on behalf of testator or those representing him. After these proceedings had been commenced, and after the death of her father, Kittie Kenney sold the California real estate for something like $18,000.

These are some of the sidelights upon the case, and it is manifest that for one reason or another defendants claim to be the owners of all of testator's property, to the exclusion of his other heirs. There seems to have been no trouble between Hugh and his father until Mrs. Kenney obtained the money and had it deposited to her husband's credit, and Hugh began the guardianship proceedings. Claim is made that the bringing of these proceedings instigated the feeling which it is contended thereafter existed between the testator and the plaintiffs in this case. Properly presented by the defendants, these might very easily have been made the means whereby to poison the testator's mind against his heirs living in Iowa. We have gone over this long record many times and with care because of the amount involved, and are constrained to hold that at the time the transfers of property and money were made to defendants John Sullivan was mentally incompetent to make them. The nature of John Sullivan's illness in the early part of the year 1906, the accompanying symptoms, the delirium which accompanied the disease, and the state of his mind and body indicated not only a physical, but a mental, break-

down. During this time Sullivan was irrational, imagined that he saw snakes, did not realize where he was, wanted to be taken home, although at that time he was at the only home he had, used foul, obscene and vulgar language, and, as he grew somewhat better, was guilty of the solitary vice. He never fully recovered from this illness; on the other hand, he seemed possessed of delusions, among other things, although well to do, he thought he was going to the poorhouse, and, although there was nothing to justify it, thought, and often asserted to others, that Hugh Sullivan's wife was unchaste, and that she was having clandestine meetings with men other than her husband. There was a hardening of the arteries, tremor, and a loss of the powers of locomotion. His memory became affected, and he failed to recognize his most familiar acquaintances, frequently repeated in his conversation, talked in a disconnected and incoherent manner, and never thereafter was able to take care of himself. When in health, he made no distinction between his children or their representatives, and always spoke of dividing his property on an equitable basis among them. He thought men who made wills were foolish; that he intended, when he died, to have his property divided equally among his children.

The money transaction at the bank when Kittie Kenney returned to Iowa the second time in the year 1906 is suspicious, and following almost immediately upon the secret transfer of the California orange ranch indicates the power which she had over her father. This is readily explained upon the theory that the old gentleman became possessed of the notion that his daughter-in-law was unchaste, that she was threatening to poison him, and would do so unless he were taken away from her home where he was then living. The return of the defendant Kittie Kenney with her husband from California to Iowa in

the early part of September, followed by transfers to them of the orange ranch in California, and of the money in the bank, is suspicious to say the least. These conveyances were entirely voluntary, and it also appears that at the very time the first guardianship proceedings were commenced defendants had taken John Sullivan to a bank in Prairie City and were there endeavoring to secure' a loan of $7,000 or $8,000, proposing that John Sullivan would become surety for them. As soon as the notice of guardianship was served, defendants announced that deceased would not return to Hugh Sullivan's home, and he never did return there. He was taken to private boarding houses, and supported there either by Hugh or by the defendants until he was taken to California, after being taken from his regular boarding place and kept over night just prior to the departure for California. Deceased did not return to the Hugh Sullivan home for any of his clothing or other effects which were left there when he went or was taken to town and had made the transfer of the money in the bank. His intent to go to California at that particular time, if he had any, was not disclosed to any one, and defendants' purpose to take him there seems to have been carefully concealed. Before leaving, however, defendants secured a deed to the five hundred and seventy-two acres of land in Iowa, paying nothing whatever therefor, and thus acquired practically all of the property of the deceased. This, too, was kept secret until John Sullivan was safely on the way to California. The contemporaneous agreement for support was also carefully guarded from the public eye and never saw the light until the trial of these cases. So that in some manner defendants secured the title to all of decedent's property without paying anything therefor and without consideration, save as it be found in the secret agreement for support. Arriving in California, deceased became

somewhat better physically, and, although many witnesses say that his mentality appeared to be good for one of his age, it is significant that during the entire time he was in charge of trained nurses and never was left alone. It is conceded that he entirely collapsed, both mentally and physically, July 30, 1907, but the testimony with reference to this matter indicates that this was not a sudden unexpected matter. Indeed, the history of the case seems to indicate that testator was suffering from *senile dementia,* which finally passed to that state known as *paresis.*

That decedent was possessed of insane delusions at the time he made the conveyances in question we have no doubt, and that defendants by some means acquired great influence over him is just as certain. That they became skeptical of the validity of the conveyances and transfers is confirmed by their conduct after they reached California. Instead of being content to rely upon their conveyances, they induced Sullivan to make a will in which the deceased practically willed all his property to his daughter Kittie. This will was executed but twenty days before the testator's conceded collapse, and to this we shall hereafter make reference. True, a number of witnesses from California, including some experts, testified that in their opinion Sullivan was sound in mind while in California down to the day of his collapse in July of 1907; but none of this testimony meets the showing made by plaintiffs of testator's having hallucinations and insane delusions at the time the conveyances and transfers were made. It is well known that one may be so afflicted, and yet not show it unless their minds are directed to the subject-matter thereof. Some of the experts in California testified that John Sullivan had few, if any, symptoms of *senile dementia;* but they are disputed by experts who attended upon him here in Iowa. Unfortunately

for the cause of truth, we rarely find experts agreeing in such cases. Such situations are discreditable to a learned and honorable profession, and suggest that oftimes opinions are colored to meet the exigencies of the case. Some solution of this problem must be found or medical expert testimony might almost as well be discarded. Testator never transacted any business after going to California, save to make the will to which we have hitherto referred. He was closely watched, and was constantly attended by nurses. He was present when depositions were being taken for the trial of some of these cases, but was not examined as a witness, and gave no heed to what was transpiring in his presence. Without stating more of the record, for this opinion has already outgrown proper bounds, we are constrained to hold that, when the conveyances and transfers in question were made, Sullivan was possessed of insane delusions and hallucinations that affected his mental processes, and that, owing to the condition of his mind, it became easy for defendants to secure the conveyances which they did through the influence they had over the deceased.

As to the will we are of opinion that it was obtained through fraud and undue influence easily exerted because of the proceedings which had been instituted by Hugh Sullivan for the appointment of a guardian and to set aside the various conveyances and transfers. Deceased became absolutely dependent upon defendants after they secured his confidence while here in Iowa. He was supplied by them with nurses and with all the necessaries and conveniences of life, and it is not difficult to understand what influenced him to make the will. After considering the whole record, we are satisfied that deceased was mentally unsound from the time of his attack in the year 1906. His delusions were such as to cause him to do the things he did and

11. Wills: undue influence: evidence.

to forget his former intentions and purposes in the disposition of his property. Thinking that his son's wife was unchaste, that she intended to and would poison him, becoming enraged at his son for bringing the guardianship proceedings, it was easy to secure the transfers in question.

We are also of opinion that the trial court was justified in finding that deceased never voluntarily and intentionally changed his domicile. Defendants could not do this for him, and, without sufficient mind and volition to acquire a new domicile himself, no one else could do so for him. This is so elementary that no decisions need be cited in support thereof. Upon this question of fact arising in the case for the probate of the foreign will, the conclusion of the trial court upon a conflict in the testimony is conclusive. Having no domicile in California, the courts of that state had no jurisdiction to probate the will and the proceedings of the California courts in admitting the same to probate must be disregarded. Were we to admit the will on the theory that the California court had jurisdiction, we should nevertheless be compelled to hold that the trial court committed no prejudicial error in denying probate in this state, for the reason that in our opinion this will was procured through undue influence, and should be set aside for that reason alone. Indeed, we are of opinion that testator did not have capacity to make a will after his attack in January of the year 1906. But these propositions need not be definitely decided at this time. The so-called sidelights to which we have referred during the course of this opinion are important, for they strongly confirm the conclusions reached.

II. The only other question which we need consider is the claim that the trial court had no jurisdiction over the California property in any of the actions now before us. Of course, courts of this state can not grant partition of lands lying in another jurisdiction, but they do

have jurisdiction over actions purely *in personam*. If any

12. SALE OF REAL
PROPERTY SIT-
UATE IN A FOR-
EIGN STATE:
jurisdiction
of proceeds.

of these actions be to secure a conveyance of the California lands or to declare a trust therein, then the courts of this state do have jurisdiction, although the *res* may be in another commonwealth. This proposition is supported by the unbroken voice of authority. See *Barringer v. Ryder*, 119 Iowa, 121; *Epperly v. Ferguson*, 118 Iowa, 47; *MacGregor v. MacGregor*, 9 Iowa, 65; *Massie v. Watts*, 6 Cranch 148 (3 L. Ed. 181); *Monnett v. Turpie*, 132 Ind. 482 (32 N. E. 328); *King v. Pillow*, 90 Tenn. 287 (16 S. W. 469); *McGee v. Sweeney*, 84 Cal. 100 (23 Pac. 1117); *Noble v. Grandin*, 125 Mich. 383 (84 N. W. 465). While the actions were pending Kittie Kenney disposed of the California real estate, receiving $18,000 in cash therefor. The proceeds of the land thus became personal property, but they partook of the nature of the real estate, and the fund can be followed into her hands, and disposed of by a court having jurisdiction of her person. *Farmers' Bank v. Kimball Co.*, 1 S. D. 388 (47 N. W. 402, 36 Am. St. Rep. 739); *Borchert v. Borchert*, 132 Wis. 593 (113 N. W. 35). No complaint is made of the decree dividing this property, and we shall take it for granted that the division was correct.

No other complaints are made of the orders and decrees, and finding them sustained by the law and the facts, they are each and all *affirmed*.