LUTHER T. BURROW, ARTHUR H. BURROW, WILLIAM H. BURROW and LUTHER T. BURROW, Guardian of CHARLES M. BURROW and NELLIE G. BURROW, Minors, Appellants, v. ELLEN HICKS, Appellee.

Conveyances: UNDUE INFLUENCE: EVIDENCE. A grantor's mental
1 capacity is material on an issue of undue influence in procuring the deed, but not controlling.

Same: DELIVERY. Recorded deeds found in the possession of the
2 grantee are presumed to have been delivered.

Same: UNDUE INFLUENCE: BURDEN OF PROOF. The burden of estab-
3 lishing undue influence in the execution of a deed is upon the party attacking the instrument, unless the grantee occupied such a relation of trust or confidence that the making of the instrument, at the time of its execution, expressed the purpose of the grantee rather than that of the grantor.

Same: CONSIDERATION. Love and affection is sufficient consideration
4 to support a conveyance from parent to child, and the mere fact that a money consideration is recited when none in fact passed will not invalidate the conveyance.

Same: UNDUE INFLUENCE: EVIDENCE. The evidence in this case on
5 the question of undue influence in the execution of conveyances from a father to his daughter is reviewed, and is held insufficient to show such influence as to require setting the conveyance aside.

*Appeal from Sac District Court.*—HON. Z. A. CHURCH, Judge.

SATURDAY, APRIL 10, 1909.

REHEARING DENIED TUESDAY, NOVEMBER 23, 1909.

SUIT in equity to set aside conveyance made by Maurice Burrow, deceased, to defendant, Ellen Hicks, because made through undue influence exercised by defendant upon the deceased, and for the reason that the deeds were never delivered. The answer was a general denial, and upon trial to the court a decree was entered dismissing plaintiffs' petition, and they appeal.—*Affirmed.*

*F. F. Faville* and *S. M. Elwood,* for appellants.

*Tait & Jackson* and *W. A. Helsell,* for appellee.

DEEMER, J.—Plaintiffs are the children and heirs at law of Thomas Burrow, who died in Sac County, Iowa, May 15, 1906. Thomas Burrow was the son of Maurice Burrow, and defendant is his daughter. Upon the 19th day of May, 1906, deceased, Maurice Burrow, conveyed the lands in controversy, consisting of one hundred and sixty acres of land, to the defendant, his daughter; and died May 31 of the same year. Plaintiffs claim that the two conveyances whereby the title was transferred to the defendant were and are void and of no effect because never delivered during the lifetime of the grantor, and also say that Maurice Burrow was very weak, both in body and mind, at the time he signed them, and in such condition as to be easily influenced and imposed upon; that, taking advantage of his enfeebled condition, defendant induced him to make the deeds; that the conveyances were without consideration, and were and are of no validity. These

are the exact issues in the case, although plaintiffs insist that the conveyances are invalid because the grantor lacked mental capacity to execute them. We find no such issue tendered by the pleadings, and must try the case on this appeal upon the pleadings filed in the district court.

We may at once eliminate the question of mental capacity, save as it has bearing upon the issue of undue influence. Of course, such testimony is very material, although not controlling on that issue. As the deeds were found in defendant's possession, and are duly acknowledged and recorded, there is a presumption that they were delivered, and the affirmative testimony is such as to leave in our minds no doubt regarding the actual delivery of the deeds. That they are not testamentary in character is also very fully shown.

1. CONVEYANCES: undue influence: evidence.

2. SAME: delivery.

The only doubtful or debatable question in the case is, Does the testimony show that they were procured from Maurice Burrow by undue influence? Upon this proposition the case is close, and but for the rule imposing the burden upon plaintiffs of proving the alleged undue influence, we should have some difficulty in arriving at a satisfactory conclusion. Defendant stood in no such relation of trust or confidence as to impose any burden upon her. True, she was assisting in the care and nursing of her father for some weeks before his death, but this was at the request of her brother, the father of plaintiffs. The deceased was no more dependent upon her than he was upon plaintiffs or their mother, as he lived with his son Thomas before his (Thomas') death, and with the plaintiffs after Thomas' demise, where he had made his home for more than thirty years. Defendant was doing nothing but her duty in assisting in the care of her father, and the other relations between them were not of a character

3. SAME: undue influence: burden of proof.

to shift the burden upon her to explain the nature of the conveyances. On the contrary, the burden was upon the plaintiffs to prove the undue influence alleged. *Perkins v. Perkins,* 116 Iowa, 253; *Dean v. Dean,* 131 Iowa, 487; *Reeves v. Howard,* 118 Iowa, 121; *Gates v. Cole,* 137 Iowa, 613; *Vannest v. Murphy,* 135 Iowa, 123.

As defendant is the daughter of the grantor, love and affection was a sufficient consideration for the conveyances; and, although it be shown that no money passed at the time the deeds were made, and although they recited a money consideration, they are not for these reasons invalid.

4. SAME: consideration.

For appellants it is contended that their grandfather when he made the conveyances was very weak, both mentally and physically; that he was practically upon his deathbed; that defendant and her husband, taking advantage of his infirmities, induced him to make the deeds in question, which were without consideration, and that he was in some manner imposed upon, and induced to make the conveyances which he would not have done on his own volition— substituting their wills for his, and securing an advantage to which they were not entitled. In the further discussion of the case, for the sake of brevity and clearness, we shall designate Maurice Burrow as "Burrow," and his son Thomas as "Thomas." Burrow, with his family, consisted of his wife, who died in 1873. Thomas, and defendant, Ellen Hicks, *nee* Burrow, came to Sac County, Iowa, about the year 1870, and settled upon one hundred and sixty acres of land which was afterwards deeded to Thomas, and which he owned at the time of his death. Ellen worked as a field hand upon the farm, save when she taught two or three terms of school, down to the time of her mother's death. After that, and until the year 1880, she kept house for him (Burrow), and for Thomas and the hired help upon the farm. In 1880 she and her

5. SAME: undue influence: evidence.

husband moved to a farm owned by him, something like three-fourths of a mile from Burrow's house. During the time she was at home, and while teaching school, she contributed all her earnings to the general fund for the support of the Burrow family and household. She never received any consideration for her services, and had nothing from her father until the deeds in question were executed. Thomas always resided with his father, even down to the day of his death—it may be as head of the household, although this we do not regard as very material. Title to the one hundred and sixty acres of land in Sac County was taken in the name of Thomas, and in 1876 he also held, in addition thereto, eighty acres of land lying in the same county. Thomas had become so involved that in the latter year he made a deed of the entire two hundred and forty acres to his father, with intent, no doubt, to delay his creditors. Burrow also acquired title to two hundred acres of land before the year 1896. In the latter year Burrow reconveyed to Thomas the one hundred and sixty acres of land theretofore conveyed to him by Thomas, and also at the same time conveyed to Thomas one hundred and twenty acres of land in place of the eighty acres conveyed to him by Thomas, leaving one hundred and sixty acres in his own name, being the land in controversy. Thomas married some time in the year 1881, and brought his wife to the home of his father, and during all the time covered by these transfers there was no change in the actual possession of the land. Thomas managed all the lands, collected the rents and profits thereof, which he used for his own purpose, and had the entire management of the lands, whether in his own name or that of his father, down to the day of his (Thomas') death. When Burrow conveyed the one hundred and sixty acres to his son he reserved one room in the house to himself, and took his meals with Thomas' family. All lived together until after the death of Thomas, and his widow, and plaintiffs, the

children of Thomas, still live upon the one hundred and
sixty acres of land. Burrow had not left the farm, even to
go to a neighboring town, for fourteen years prior to his
death, and his wants were simple and easily supplied.
Thomas was taken sick during the last of March or the
first of April, 1906, and was confined to his bed until May
15, when he died. Something like two or three weeks
before the death of Thomas, his father, who was then about
eighty-one years of age, went into a decline. He had
heart or asthmatic trouble, or both; suffered from rheu-
matism, and also from kidney disease, and about two weeks
before his death dropsy set in, so affecting his lower ex-
tremities that they had to be bandaged.

Some time before he died Thomas sent for defendant
to come over and help take care of the father, as his own
sickness required the attention of his family, as well as
a nurse. Defendant went to the Burrow place pursuant
to this request, where she remained, aiding and assisting
in caring for her father until his death. A few days
before Thomas died he made a will, the contents of which
are not fully disclosed by the record. For some days
prior to the making of the will Burrow was importuning
his son for money, which it seems he did not secure. It
appears that the father and son never had any accounting
of their business transactions, although it is practically
conceded that Thomas had money belonging to his father,
which had been collected from lands belonging to the
father, as well as from other sources. We doubt not that
the will was made largely because of these demands from
the father, and through fear of complications arising after
the death of the son. After Thomas had made his will
he called defendant and his eldest son (Luther) to his
bedside, saying that there was chance for trouble and
asked them that they make no trouble over his father's
money or property after he (Thomas) was gone. The
contents of the will seem to have been made known

to Burrow, and shortly thereafter he expressed dissatisfaction therewith, and stated that Thomas had $4,000 or $5,000 of his money which he had not accounted for. He also declared at this time that he wanted the defendant to have the one hundred and sixty acres of land still remaining in his name. The witness who testified to this appears to be truthful, and to have had no other purpose than to disclose the exact situation. On the afternoon of that day, so it is claimed, he asked defendant to send for a notary public, who was also a banker in a neighboring town, to come out and make some deeds. Defendant sent one of her sons for the notary, who was directed to come at once. When he arrived at the Burrow home he found defendant and her husband and Mrs. Thomas Burrow. The notary went into the room where Burrow was, drew two deeds, each conveying eighty acres of land, making defendant the grantee in each, one reciting a consideration of $500, and the other of $300, which deeds were signed by Burrow, and then and there delivered into the hands of the defendant. Mrs. Thomas Burrow was in and out of the room while these deeds were being prepared, but she testifies to nothing occurring at that time which would indicate undue influence. That evening after the deeds were drawn, Mrs. Burrow having knowledge thereof, some controversy arose between defendant and the members of the Burrow family over the execution of these deeds, and threats were made by Thomas Burrow's heirs that they would attack them, although no suggestion was then made of undue influence. Burrow had no money or personal property at the time of his death, and received little or nothing from his son Thomas at any time. It is contended that Burrow made the deeds to the defendant without undue influence, but for the purpose of equalizing the amount that his two children or their representatives should receive. Without any deeds defendant would have received one eighty acres of land, and plaintiffs, as successors

of Thomas, would receive the other—this may explain why the two separate deeds were made, although no such explanation is given in the testimony.

Upon the issue of undue influence the fact that two deeds were made instead of one is in itself of no significance. The testimony shows that these deeds were made without present suggestion from anyone save the elder Burrow. True, there was no consideration in fact for them, although they each recited a present consideration. This was inserted, however, at the suggestion of the notary who drew the deeds. Mrs. Thomas Burrow was in and out of the room while the conveyances were being prepared, and she made no objection thereto at the time. True, that evening in the presence of her family she made objection to the deeds, and some trouble arose regarding the matter, but it was not then suggested that she had unduly influenced her father. The claim then was that the deeds were not delivered. We think it sufficiently appears that defendant did say that the deeds were in her father's room until Thomas' will was read, and there was some talk that they were not to be delivered until the father's death. There are some things which do tend to show undue influence. Among these was the manner in which the notary was called, the haste with which the transaction was brought about, the fact that defendant's husband gave the notary the description of the lands from memorandum made by him, and defendant's statements after the deeds were made. But these things are explained in a more or less satisfactory way. It appears that defendant did not have full charge and control of her father during his last illness. He was taken care of in the daytime by defendant and Mrs. Thomas Burrow, and at night by the children of Thomas. Burrow was evidently somewhat concerned over the disposition that Thomas had made of his property by will, and Thomas had also shown his concern over the same matter. There was, it is true, oppor-

tunity for defendant to influence her father, but that she did so is left solely to inference. The notary who drew the deeds says that no sort of influence was exerted over Burrow to induce him to make the deed while he was present, and that Burrow named the grantees to be inserted, and directed that the deeds be placed of record. The case is close upon the question of undue influence; but, as the trial court had the witnesses before him, and was in a somewhat better position than we to know and appreciate whether plaintiffs had met the burden imposed upon them of showing affirmatively undue influence, we are not disposed, after considering the entire record, to reverse the holding.

Our conclusions upon the whole case are that the judgment should be, and it is, *affirmed*.