MARIA CATHERINE OLSEN, Appellant, v. OLE L. OLSEN, JR., et al., Appellees.

**DEEDS:  Deed to Child—Validity—Fraud—Undue Influence.  Evi-**
1  dence reviewed and held to fully show that a deed from an aged grantor to her son-in-law and daughter was in part intended as a gift and in part to compensate the son-in-law for services performed for grantor's deceased husband and was free from fraud or undue influence.

**DEEDS:  Constructive Fraud—Fiduciary Relation—Burden of Proof.**
2  Constructive fraud cannot be inferred from the execution of a conveyance by an aged grantor to her son-in-law and daughter, in part as a gift to the daughter and her children and in part to pay the son-in-law for services performed by him for grantor's deceased husband, when the son-in-law and daughter transacted no part of grantor's business, were not her advisors, and when grantor's son had sole charge of her business.

*Appeal from Audubon District Court.*—HON. O. D. WHEELER, Judge.

TUESDAY, FEBRUARY 9, 1915.

THIS suit was brought to set aside certain conveyances made by the appellant, conveying to appellees all of her property, except her homestead, for want of consideration, on the ground of fraud and undue influence. The trial court refused to set aside the conveyances, but required defendant, Hans A. Bladt, to convey land received by him to his wife and to account for money intended by plaintiff for the children of Hans and Caroline. The plaintiff appeals.—*Affirmed.*

*Byers & Byers,* for appellant.

*Mantz & White* and *W. R. Green,* for appellees.

PRESTON, J.—Plaintiff was the owner of two hundred and sixty-four acres of land in Audubon and Shelby counties and, in addition to the real estate, she was the owner and in possession of personal property of the value of about $13,000.00. She further claimed that on or about February, 1909, under pressure of undue influence and threats of her son-in-law, Hans A. Bladt, she conveyed all of her property to the said Bladt and his co-defendants, retaining for herself only a life interest in forty-six acres of the land, and claimed that all conveyances were made without consideration and were made under duress. She asked that the conveyances be set aside.

1. DEEDS: deed to child: validity: fraud: undue influence.

The appellees, Caroline Bladt and Hans A. Bladt, deny all the allegations of the appellant's petition except paragraphs 1 and 2; admit the execution and delivery of the conveyances, and claim they were made and accepted in good faith; deny that the conveyance to Hans A. Bladt was made without consideration, but allege that, while the same was executed for and on behalf of, and as a gift to his wife, a daughter of plaintiff, in consideration of the relation which she bore to plaintiff, said deed was also made in settlement of a certain claim which said Hans held against the estate of

Ole Olesen, Sr., then deceased, from whom plaintiff received said land by will, and that in determining the amount of land to be conveyed to defendant, Hans, the amount of said claim was agreed upon and fixed by appraisers selected by the parties, and sufficient of said land included in said deed at an agreed price to satisfy the said claim, and that said conveyance was accepted by said Bladt in satisfaction of said claim by mutual agreement of all parties concerned.

The answer also alleges that after the execution of the second deed, about February 25, 1910, defendant Hans executed a mortgage in the sum of $24,000.00 upon the property so conveyed to him, together with other lands and property; that at the time of making said mortgage the plaintiff had made no objections or complaint with reference to the conveyance; made no claim that she had been misled or unduly influenced, and, relying in good faith upon the conveyance to him, defendant executed said mortgage; that after it was agreed and understood that a certain amount of property should be allotted to defendant in settlement of his claim, defendant refrained from filing the claim against the estate, and took no proceedings in regard to the same, relying in good faith upon the settlement; that the estate of Olsen, Sr., is now fully settled, and defendant can have no opportunity to file or establish his claim; that defendant up to the time of the settlement claimed he was entitled to a larger sum than the amount so allowed him and which was accepted by him in settlement; that by virtue of the proceedings had in said division the defendant became chargeable with the sum of $1,200.00 to be' held in trust by him for his children; that by reason of the settlement of the claim, the execution by him of the mortgage and the charges so made against him as trustee for his children, it is now impossible for the court to place him in *statu quo.*

The defendant, Ole L. Olesen, Jr., filed no answer. He testified as a witness for his mother, the plaintiff.

We are satisfied from the evidence that plaintiff desired a

division of her property rather than to make a will giving it to her children, and that she voluntarily agreed that it should be done by referees, or a committee, as they are called by some of the witnesses; the committee to consist of three of her own nationality. The three men so selected seem to be men of standing and were confidential friends of the plaintiff and her family, and we find that the division of the property as between the children was fair, and at the time and for some time thereafter plaintiff and the son Ole were satisfied, though they now say they were not satisfied. The real cause of the trouble, we believe, is because the son, Ole, thought his brother-in-law, Bladt, took away from the farm some fruit jars, boards, and like small items, when Bladt moved off that part of the lands set off to Ole and rented by Bladt for the year after the division. Ole employed attorneys to commence this suit, after discussing the matter with the plaintiff. Plaintiff testifies:

"Ole hired the lawyers; it was a long time ago, some time last winter. I knew Ole was going to see an attorney about it. He did not like the way the property was divided. He said he was going to have a suit commenced to get a little more of the property; he did not think he had as much as he ought to get. He thought Hans Bladt got too much."

Ole testifies: "Q. You knew how much is allowed on everything, and who got everything, did you not? A. Well, not everything, because there were things that were not allowed on, that was not appraised but still was taken off of the place. Mr. Bladt took them when he left a year later, and that is what started this trouble."

It is not claimed by plaintiff that there was any fraud on the part of the son, Ole, in regard to the division of the property. The evidence to support plaintiff's claim is, in the main, that of herself and her son, Ole. There were several witnesses for defendants, some of them disinterested. While there were not many witnesses, their examinations were

exhaustive. We shall not attempt to set out even the substance of it. There is no claim even now that Bladt's claim for ten years' services for plaintiff's deceased husband was not a just claim, or that the allowance of $5,000.00 was too large.

By its decree, the trial court found, substantially: That on January 18, 1909, Ole L. Olsen, Sr., died testate, leaving a widow, the plaintiff herein, and two children, to wit, a son, Ole Olsen, Jr., and a daughter, Caroline Bladt, the wife of the defendant, Hans A. Bladt. By the terms of his will, he devised all his property, both real and personal, to his widow absolutely. That the property thus devised to the plaintiff consisted of about two hundred and sixty-four acres (the land was described in the decree). That the plaintiff at the time of the death of her husband was about seventy-seven years of age. That for about ten years prior to the death of the said Ole Olsen, Sr., Hans Bladt and his family had resided with him in his home, and the said Hans Bladt and his family had worked and lived as members of the family, without receiving other remuneration than their board and clothes and other living expenses. When coming to make their home with the old people they had also brought all their belongings, including their stock and implements, and all of such property was commingled with the common property upon the home farm.

That Ole L. Olsen, Jr., one of the defendants herein, had, for many years prior to the death of his father, been an invalid subject to attacks of epilepsy, and had very little experience in business affairs.

That soon after the death of the father, the plaintiff determined to make a division of the property among her children; three men were selected who should make a division of the property, first fixing the amount to be paid to the said Hans Bladt for his services during the time he had thus lived in the family as a member thereof. The three men thus selected were S. C. Pedersen, W. Rattenbourg and Peter Kromen, and all were disinterested persons.

That in February, 1909, the three men thus selected met

at the plaintiff's home and together with all of the parties to this suit talked over the matters relating to the proposed division of the property.

That at said time plaintiff instructed the referees aforesaid that she wanted them to determine what amount should be allowed the defendant, Hans A. Bladt, for his services as aforesaid; that she wanted to set apart $1,200 for the children of Hans Bladt; and that she wanted them to divide the balance equally between Ole L. Olsen, Jr., and her daughter, Caroline Bladt.

That the referees thus appointed then determined that Hans Bladt should receive $5,000 for his claim for services during the ten years he had served in the family of the deceased. They found the personal property upon the farm to be of the value of $7,800, and this, at the instance of Ole L. Olsen, Jr., was turned over to Hans Bladt for himself and Caroline Bladt, as part of their share and as part of the amount due Hans Bladt for services:

They found the personal assets of the estate to be as follows:

Personal property, stock, farm machinery, etc......$ 7,800
Notes and certificates of deposit...................  5,024
Cash on hand ...................................    150

        Total ...............................$12,974
        They found the following charges against the
            estate:
Note at Elkhorn Bank....................$  300
Due Hans Bladt for services.............. 5,000
Amount to be set apart for children........ 1,200      6,500

Balance to be divided into equal shares...........2)$6,474

Share of each in personal property.................$3,237

The referees then divided the lands into two separate parcels, the northern portion containing about........acres

and comprising the Northwest quarter of the Southwest quarter of 30-79-36, the Northeast quarter of the Southeast quarter of 25-79-37, and having upon it all the buildings and improvements; and the southern portion containing about 133 acres.

The referees also determined that the widow should have the use of the homestead forty, upon which were situated the buildings and improvements, for the remainder of her life, and that the remainder thus left should go to the one who selected the northern portion thus set off by them. They further determined that the northern portion, after thus taking out a life estate for the widow, exceeded the southern portion in value to the extent of about $1,500, and that the one selecting the northern portion should pay the one to whom fell the southern portion said sum of $1,500 in order to equalize said tracts in value.

After thus having divided said lands and informing the parties of such terms, Ole L. Olsen was granted the privilege of choosing which of said tracts he would take, and he chose the northern portion, and such tract was set apart to him. Caroline Bladt was asked if the lands should be set off to her or to Hans Bladt, and she directed that it be set off to Hans Bladt, her husband, and the southern portion was then set off to him, for her, and a contract was drawn embodying the terms of said division.

Deeds were not at that time drawn, but later, in April, 1909, deeds were drawn and signed and delivered in accordance with the terms of the agreement. And later, in February, 1910, other deeds were executed and delivered to correct defects in the first deeds.

That all the negotiations relating to the division were conducted in the Danish language and the plaintiff fully understood the nature of the transaction and fully assented thereto. That such division was at her own instance and that she was not under any duress or any influence whatever. That all such transactions were voluntary upon her part.

That in such division the $1,200 which the plaintiff directed should be set apart for the benefit of the children of Hans and Caroline Bladt was placed in the hands of the defendant, Hans Bladt, and the deeds for the shares of the lands which the plaintiff directed should be set apart to her daughter, Caroline Bladt, were, at the instance of the daughter, put in the name of Hans Bladt, and the court is of the opinion that equity ought to require, under the plaintiff's prayer for general equitable relief, that the defendant, Hans Bladt, place the title in the lands received by him in such division in the name of Caroline Bladt, for whom they were intended by plaintiff; the Court will also require that the $1,200 which the plaintiff directed to be set apart for the use and benefit of the children aforesaid, be placed in the hands of a guardian for said children, under such prayer for general equitable relief.

It is therefore ordered, adjudged, and decreed by the Court:

1st. That the defendant, Hans A. Bladt, within thirty days from this date, make, execute and deliver to his co-defendant, Caroline Bladt, a good and sufficient deed conveying to her all of the real estate which he received under the conveyance from the plaintiff, in question in this case; and that in the event of his failure so to do, the Clerk of this Court as a commissioner execute and deliver to her for him a good and sufficient deed, which shall pass all title now held by him in said lands, such deed to be executed, delivered and recorded at his expense and taxed as part of the costs herein against him.

2nd. It is further ordered, adjudged and decreed that the said Hans A. Bladt, within thirty days from this date, account to a guardian to be appointed for said children by the Clerk of this Court, for the said sum of $1,200 together with interest thereon at the rate of six per cent per annum from February 26, 1909, and it is ordered that unless the said Hans Bladt or Caroline Bladt duly qualify as guardian of said minor

children within thirty days from this date, the Clerk shall appoint some suitable person as guardian of said minor children, who upon being duly qualified shall proceed to collect said funds from the defendant, Hans A. Bladt.

3rd. The Court finds that, as to all other matters complained of in plaintiff's petition, the equities are with the defendants, Hans Bladt and Caroline Bladt; and it is ordered that as to all other allegations therein contained, said petition be dismissed.

4th. It is ordered that each of the parties shall be taxed with the costs of service and attendance and mileage of each and all witnesses summoned by such party; that all other costs of this action be equally divided into two parts, one of which shall be taxed to plaintiff and the other to the defendants, Hans A. Bladt and Caroline Bladt, and it is ordered that judgment be entered accordingly and that execution issue to enforce the payment of the same.

We are satisfied that the weight of the evidence clearly sustains the court's findings. It is the claim of appellant, and her counsel cite authorities in support of their contention,

2. DEEDS: constructive fraud: fiduciary relation: burden of proof.

that where the consideration for the transfer of property is inadequate and the transaction is in other respects inequitable, unfair and unconscionable, a court of equity will set the transfer aside, and that contracts made between persons sustaining a relation of trust and confidence, where it appears that the stronger and controlling mind has obtained an advantage, are jealously guarded by the courts and are set aside unless the beneficiary shows the good faith of the transaction; that acts and contracts of persons who are of weak understanding, and who are thereby liable to an imposition, will be held void if the nature of the acts or contracts justifies the conclusion that the party has not exercised a deliberate judgment, but has been imposed upon, circumvented or overcome by cunning, artifice or undue influence. That the burden is upon the grantee, in a deed made without consideration, where

it appears that the deed conveys substantially all of the property of the grantor and was made to a person closely related, to show that it was made voluntarily and without undue influence to secure the same. And that where one is greatly affected by the death of a husband, and at times indicates much mental distress, a conveyance obtained by taking advantage of the condition of a person in such a state will be set aside as fraudulent. Appellees do not question the law thus cited. .

The trouble is with appellants' contention that the evidence is against them. The relations between plaintiff and Bladt and his wife were not such as to constitute the relation of trust and confidence and to cast the burden upon appellees, or bring the case within the rule of *Curtis v. Armagast*, 158 Iowa 507, and like cases. The transaction was intended as a gift of the land to her two children, and also a part of the personal property, and a settlement of the claim of Bladt. Though the deed was executed to Bladt instead of his wife, this was done at the suggestion of the wife, and there was no objection on the part of anyone at the time; the decree requires Bladt to convey the land to his wife.

We have said that appellant relies on the evidence of plaintiff and her son, Ole, more perhaps on that of Ole. He contradicts himself at many points in his testimony. As to some of the circumstances, he would not commit himself as a witness, but says he would not deny that things were not said or done as later testified to by witnesses for defendant. The evidence does not show that she was overreached or overcome by artifice or undue influence. True, she disposed of a large amount of property, but the clear weight of the evidence is that such was her desire and that she did so voluntarily. She retained forty-six acres, the rental value of which was $8.00 per acre, and each of the heirs agreed to pay her $60.00 per month, or year, during her life; the abstract, in referring to the contracts, sets it out at $60.00 a month, but the evidence seems to be that it was $60.00 per year. This makes nearly

$500.00 a year for her. One of the witnesses testifies, without dispute, that this was more than she had been used to. It may be that it would have been better for her to retain the property and dispose of it by will, and she was so advised by some of the referees, but she said she wanted to divide the property then. It was her property, and she had a right to divide it between her children if she wished to do so, and if she was competent and did so voluntarily, without fraud, the conveyances are binding.

There is no evidence that Bladt ever did any business for plaintiff, that she ever had any confidential relations with him, or that he ever gave her any advice. He did a large part of the farm work, but was at all times under the supervision of the husband of plaintiff. He sometimes did some buying for the senior Olsen, the nature of which is not disclosed by the evidence. Plaintiff testified that her son, Ole, and no other, had been doing whatever business she had during the last two years since her husband's death; that Ole had been her adviser in business matters and other affairs; that Ole had been looking after her business all the time. Neither Bladt nor his wife was the confidential adviser of either the plaintiff or her deceased husband.

Plaintiff was seventy-seven years old, and naturally affected by the death of her husband, but we think it is not shown that she was more affected by this than the average person would have been under like circumstances. Shortly after the death of her husband she was attending her household duties as usual. It is true that she had no experience other than that of a farm housewife, but she testified that she knew that her husband had made a will and had given her all the property; knew that the property had to be taken care of through the court and settled up in that way; that after Ole had been to town to see about the will he talked to her about it and told her that the will left her all the property, to do with as she pleased; she says she knew that she could do just as she wanted to with all of the property. She was sick

at one time after her husband's death, but was better, and
testified at length on the trial; the weight of the evidence
shows that within a few weeks after the death of her husband,
and before the division took place, or was discussed, plaintiff
was discharging her duties as executrix of the estate of her
husband, and there is no showing she was not doing so as well
as people usually do under the circumstances.

It is said by appellant that soon after the death of the
Senior Oleson, Bladt and his wife began suggesting to plain-
tiff that the property ought to be divided among the children.
But we think the record does not bear out the claim.   Plain-
tiff herself does not testify that Mrs. Bladt ever suggested a
division, and the daughter testifies that she never mentioned
it to her mother.   Ole testified:  "I do not know that my
sister was pressing to have this property divided, but her
meaning was the same as her husband's wholly."   This is a
conclusion, and he does not at any place state that his sister
ever said anything on the subject.   Ole testifies that Bladt
was wanting a division of the property, and says that Bladt
said if she would not go ahead and do it right away, then he
would, and told her that he was ready to fight to the last
stump.   Bladt said he wanted to know right away.   He says
he and Hans did not quarrel about it that day; that Hans
went away and afterwards came back and brought with him
Mr. Rattenbourg; that the matter was then discussed as to
which would be the better way to have a division made, by a
committee, or by lawyers, as Ole puts it; that it would be
cheaper to have three men do it.   It was talked as to how three
men should be chosen; Bladt offered to allow plaintiff and
Ole to select all three, and there is no question but that the
three who were selected were fair men, and as before stated,
were friends of the family.   Ole then says:

"I heard talk like that until we gave them permission to
do the dividing of it, and then she said how she wanted it
divided.   She wanted certain amounts taken off and the rest

of it to be divided equally and in no other way. First she wanted the expenses paid, if there was any, and then Mr. Bladt paid for his work, and then she wanted $1,200.00 taken out and set out on interest for Mr. Bladt's children; that those three sums had to be taken off first and then the rest of it was to be divided equally between me and my sister; they said it was all right.''

Rattenbourg was one of the referees. The other witnesses do not mention the alleged threat of Bladt, as testified to by Ole, and Bladt and some of the others deny that there was any such talk. We are satisfied from the entire record that the most that can be said is that Bladt was insisting at that time upon an understanding as to his claim for wages and as to whether he could get the farm leased for another year. It appears that because Bladt had not been paid his wages he was without money; the first of March was approaching and he had no place to go; he could get no satisfaction from plaintiff or Ole as to whether he should stay on the farm another year, and as to what would be done with his claim; that he had no place to take his wife and children, and he was insisting that there ought to be an understanding about the matters. He did say, in substance, that if his claim was not allowed there would be a law suit, and we are satisfied that whatever trouble there was, was in regard to his claim and the settlement of it, and as to whether he should stay on the farm or not. After the division, he did rent the other part set off for the next year, paying rent at $4.00 per acre and, in addition, the support of plaintiff and Ole.

It is said that the son, Ole, was not competent to advise his mother. The evidence tends to show that after he had grown to manhood he became afflicted with some malady similar to epilepsy; that he had spells. Some witnesses call it epilepsy, though no physician so testified. There is evidence that he had recovered before his father's death. Plaintiff testifies that Ole's health has been good since the death of

her husband. She says he was sick for seven years; he had epilepsy; does not know when he had the last spell; he was well for the last year before his father died.

Witness Pedersen, a neighbor, testifies as to the length of time he had known Ole; that he does not know how long he had been well, but it was the general impression in the neighborhood that he had got well before his father died.

Christensen says he knew Ole had been sick for a number of years, but that he should judge he has been well six or eight years. He, Ole, was a witness in the case and testified at length as to all matters in controversy.

All the talks had at the time of the division and leading up to it were had in the native language of all the parties, Danish. We have already shown that plaintiff had been advised and knew of her property rights. At the time of the division, when the so-called committee were all present with plaintiff, her son, Ole, Bladt and his wife and children, an old friend of the family and one of the committee selected by plaintiff, or Ole, advised her not to make the division. He asked her if she knew what they were there for, and she said yes. This person, Pedersen, testifies:

"I told her that I did not think it was right to divide up the property now. That it was hers now and nobody could get it as long as she lived. I told her, why not make a will and will it to her two children so that they could get it at her death. She answered me that she wanted to divide it now. Then she stepped in front of me and said, 'The only thing before you go ahead, the only thing or the only preference I want, I want $300.00 left out of the estate for these four children and I want Hans Bladt compensated for the years he has worked here and the remainder divided equally.' "

It appears in the record that plaintiff's husband had expressed a wish that each of Bladt's children should have $300.00.

Witness Rattenbourg testifies substantially the same as

to the conversation between plaintiff and Pedersen, and that plaintiff said that she wanted the property divided between the children; that after that there was nothing further said about dividing it. Rattenbourg was the referee or member of the committee selected by Bladt, but there is nothing to show that he was not a fair man. Bladt and Rattenbourg both testify that the only matter talked over between them before Rattenbourg came to the house was in regard to Bladt's claim for wages and his desire to rent the Olsen land for the coming season, and there is no evidence to the contrary.

Pedersen was a banker and did the clerical work in writing the contracts, deeds, etc. As stated before, the negotiations were conducted in the Danish language and, while plaintiff now claims in her testimony that she did not understand, the referees all testify that they fully explained to her the entire matter.

It is said by appellant in argument that the division was made within a month after the death of plaintiff's husband. This is not quite an accurate statement of the record. The evidence shows that it was almost six weeks before the negotiations were begun, and more than three months elapsed before any conveyances were made to carry it out. There was no dissatisfaction expressed at that time. There was no dissatisfaction expressed by plaintiff until about a year after her husband's death, and then she did not make any objection to the distribution. More than a year after the distribution was begun plaintiff visited at the home of the Bladts for five weeks, and could have stayed as long as she wished, and at that time their relations were perfectly harmonious.

About a year after her husband's death, when it became necessary to make out some new deeds to meet objections raised by the loan company of whom Bladt was obtaining a $24,000.00 loan, Pedersen took the correction deeds to the Olsen home, and at that time there was some objection to signing the new deeds. As to this matter the son, Ole, testifies:

"It was about a year after the division that he (Pedersen) was out there with the deeds, and when he spoke to my mother and I about having these deeds signed that he brought with him that day, then she and I objected because I said that Hans had taken some of this property which he should not have taken and had not settled it up right. I did not want her to sign the deeds until Hans fixed up that matter, and then he (Pedersen) told her that the signing of the deeds would not make any difference in that way and that Hans would have to fix that up right away. After he told her that she signed the deeds."

It is contended for appellees that the owner of the property, having the right to dispose of it as he sees fit, is not accountable to anyone with reference to the motive which leads him to act; that it must appear that the influence was exerted at the time the act referred to was done. That the 'fact that the act was done by reason of the influence resulting from affection or attachment, or a mere desire to gratify the wishes of another, if the free agency of the party is not impaired, does not affect the validity of the act. That the mere fact that the distribution made by a parent of his property among children appears unreasonable or unjust will not alone establish undue influence. That the mere fact that the act complained of was between parent and child will not give rise to a presumption that it was the result of undue influence.

We shall mention some of the cases cited by appellee to sustain their points. They cite: *Paulson v. Barger,* 132 Iowa 547; 4 Cyc. of Evidence, 897; *Harris v. Tyson,* 64 Am. Dec. 661; *Rendleman v. Rendleman,* 156 Ill. 568, to the point that threats of legal procedure to collect a valid claim are insufficient to make out a case of duress.

As holding that even if it appears that a deed or will is executed at the suggestion or request of the grantee or devisee, that will not prove undue influence, unless the freedom of will has been in some way impaired or destroyed, they cite: *Mallow v. Walker,* 115 Iowa 238; *Eighmy v. Brock,* 126 Iowa 535,

537; *Re Townsend's Estate*, 128 Iowa 621, 623; *Slaughter v. McManigal*, 138 Iowa 643, 646.

And that the mere impairment of physical powers by age and incident loss of mental vigor are not enough to show incapacity to direct the business of determining the disposition of property among one's children, they cite: *Slaughter v. McManigal, supra; Altig v. Altig*, 137 Iowa 420; *Re Stufflebeam's Will*, 135 Iowa, 338.

And that in the absence of fraud a deed will not be held invalid for mere inadequacy of consideration, they cite: *Brockway v. Harrington*, 82 Iowa, 23; *Burrow v. Hicks*, 144 Iowa 584.

Cases are cited on other points. But the question in this case is so much one of fact that we do not deem it necessary to further discuss the law or refer further to the evidence. The record has been carefully considered and, without further discussion, we conclude that the decree of the district court was right, and it is—*Affirmed*.

DEEMER, C. J., EVANS, WEAVER and LADD, JJ., concur.