IN RE WILL OF OREN K. EVELETH, DECEASED.

**APPEAL AND ERROR:** Review—Conflicting Evidence. A finding
1   of fact on a fair conflict of evidence is conclusive on appeal. So held in a will contest.

**WILLS:** Undue Influence—Evidence—Sufficiency. It is not enough
2   to show that there was an opportunity to exercise undue influence in the execution of a will. There must be evidence that it was actually exercised. Evidence reviewed, and held insufficient to carry to the jury the question of the exercise of undue influence.

**WILLS:** Undue Influence—Presumption. It is inferentially con-
3   ceded that a presumption of the exercise of undue influence in the execution of a will might arise from a showing that testator not only feared devisee, but disliked him; but *held*, no sufficient showing appears in the record in case at bar to warrant such presumption.

**WITNESSES:** Cross-Examination—Discretion of Court. The per-
4   missible range of cross-examination of a witness is a matter largely within the sound discretion of the trial court. *Held*, discretion not abused.

**WITNESSES:** Cross-Examination—Harmless Error. A witness,
5   cross-examined in excess of the right to cross-examine, may, *as to such excess*, be considered as the witness of the one conducting the cross-examination, with right in the party originally calling the witness to cross-examine *as to such excess;* and where such latter right is not exercised, no prejudicial error results.

EVIDENCE:   Conclusion—Inability to Adequately State Facts.   A
6   conclusion answer is often permissible, where the subject-matter
under inquiry is such that no adequate statement of facts can
be given.  So held where, in a will contest based on the charge
of undue influence in the execution of the will, a witness was
permitted to say "that he saw nothing to indicate that deceased
was under any constraint."

WITNESSES: Examination—Usurping Function of Jury.  The state-
7   ment of a witness in a will contest, wherein undue influence was
charged, that he did not, on a certain occasion, "see anything
to indicate that the testator was under any constraint," does
not amount to a determination by the witness of the ultimate
question whether undue influence was or was not exercised.

EVIDENCE:   Opinion Evidence—Wills—Mental Competency.   An
8   expert medical witness may, either from a proper hypothetical
standpoint, or from the standpoint of personal knowledge of the
physical condition of a testator, give his opinion whether testa-
tor, at the time of the execution of a will, was capable of under-
standing, in a general way, the amount of his property and who
were the natural beneficiaries thereof.

TRIAL:  Instructions—Emphasis on Particular Evidence.  Instruc-
9   tions should, generally, be refused, which call the jury's atten-
tion to particular evidence and thereby give it emphasis over
other evidence on the same subject.  So held in a will contest
(mental competency of testator being in issue) wherein contest-
ants asked the court to specifically instruct as to the effect of
devisee's former letters, wherein he stated that testator's mental
condition was very poor.

TRIAL:   Requested  Instructions—Refusal—Subject  Covered  by
10  Court's Instructions.  No error to refuse instructions already cov-
ered by court's charge.

TRIAL:  Instructions—Unsupported Theory—Will Contest.  Instruc-
11  tions on a theory wholly without support in the evidence are
properly rejected.  So held in a will contest wherein instructions
were requested on the subject of delusions on the part of testa-
tor, there being no evidence that the will was the result of any
such delusions.

*Appeal from Sac District Court.*—M. E. HUTCHISON, Judge.

FRIDAY, APRIL 7, 1916.

REHEARING DENIED SATURDAY, SEPTEMBER 30, 1916.

This was a contest over the admission to probate of the alleged will of Oren K. Eveleth. Contestants objected to the probate upon two grounds: First, the alleged testamentary incapacity of the deceased; and, second, undue influence of Emery J. Eveleth, the proponent and sole beneficiary. The case was tried to a jury, and, at the close of contestants' testimony, on motion of proponent, the court withdrew from the consideration of the jury the issue as to the alleged undue influence, and at the close of all the evidence, the court submitted to the jury the question of the alleged incapacity of the deceased to make a will, and the jury returned a verdict sustaining the will. The will was admitted to probate, and the proponent, the party named in the will, was appointed executor. The contestants appeal.—*Affirmed.*

*R. L. McCord* and *John W. Jacobs,* for appellants.

*Malcolm Currie* and *W. A. Helsell,* for appellee.

Preston, J.—1. On the issue as to the mental capacity, there was evidence to sustain the finding and the conclusion of the jury is conclusive, so that we shall take no time upon the discussion of that subject. It is enough

1. Appeal and Error: review: conflicting evidence.

to say that there was evidence both ways, and, had the jury found for contestants on that issue, we think the verdict would have had sufficient support.

At the commencement of the trial, it was admitted that the paper offered for probate as the last will and testament of deceased was signed by him and was properly witnessed,

2. Wills: undue evidence: evidence: sufficiency.

and thereupon, contestants assumed the burden and introduced their evidence. It was also admitted during the trial that deceased left an estate of $30,000. The principal question relied upon and argued is as to whether the issue of undue influence should have been submitted to the jury. The

substance of the objections on this issue are, as stated in the objections:

"That said pretended will was procured by the undue influence of Emery J. Eveleth exercised over decedent in this: That at and for some time prior to the making of said pretended will, the said Oren. K. Eveleth was and had been suffering from a mortal physical ailment and was aged, helpless and infirm, and was in mortal fear of bodily injury from said Emery J. Eveleth; that, while said decedent was in said mental and physical condition, the said Emery J. Eveleth took the said Oren K. Eveleth to his home in Sac City, Iowa, and kept him in his sole custody and control until the death of the said Oren K. Eveleth, and while said Oren K. Eveleth was in such custody and control, and in apprehension of physical injury from the said Emery J. Eveleth, and by reason thereof, the said Oren K. Eveleth made said pretended last will and testament, and that the same was not the free and voluntary act of the said Oren K. Eveleth."

And in the third division of the objections, the foregoing statements are repeated; and, in addition thereto, it is charged that proponent:

"Did threaten the said Oren K. Eveleth to have a guardian, or some other person, appointed to take charge of and manage the property of the said Oren K. Eveleth, unless he, the said Oren K. Eveleth, would make his last will and testament in substance as now offered for probate, and that, by reason of said threat and demands of the said Emery J. Eveleth, the said Oren K. Eveleth made said pretended last will and testament, and the same is not the free and voluntary act of said Oren," etc.

The form of the objections seems to indicate a purpose to attempt to bring the case within *Sullivan v. Kenney*, 148 Iowa 361, hereinafter cited, and other cases. The argument of appellants assumes that they have established by the evidence the state of facts set up in the objections, but, after reading the record, we are of opinion that the evidence falls

far short of sustaining their claims. Indeed, as to many of the things set up in the objections, there is an entire absence of testimony, and appellants do not even claim that there is any direct evidence as to any of the claims set out in the objections, but it is thought that certain inferences should be drawn from certain more remote circumstances, and that, therefore, there was a question for the jury.

There is no evidence that proponent ever mentioned the subject of a will to his father; the record does not show that proponent took his father to his home. On the contrary, it appears that he did not do so. There is no evidence in the record to sustain the claim that proponent threatened his father to have a guardian appointed of his property, unless he would make a will such as he did make; no witness testified to any act or suggestion or word on the part of proponent, who was alleged to have exerted undue influence, looking towards an effort on his part to secure a will for his own benefit. At the time of the proponent's motion to withdraw this issue from the jury, there was no evidence that anybody had ever mentioned to deceased the subject of making a will. Perhaps we should leave this point for the present and go back to a brief history of the case.

It appears without dispute that testator was the father of nine children, two now deceased and one insane. The proponent, his oldest son, and the contestants, are his other living children. Testator and his wife were divorced in Wisconsin in 1886. The wife was awarded the custody of the children, and the property was divided. The wife died three years ago; deceased never went back to visit his family. Shortly after the divorce, deceased came to Sac County, Iowa, where he resided until his death; and the proponent came with him and lived with his father for some time. He and his father operated for some time a farm which the father bought. The other children remained with their mother in Wisconsin. One or two of the children who are contestants came to see the father in Sac County a time or two, and one

of the daughters and her husband lived with him a short time and then went to Missouri. Proponent has resided in the same county as deceased. Some 10 or 12 years ago, deceased had a spell of sickness which resulted in confirmed asthma, and, .for the last few years, he spent the winters in the south. Deceased seems to have been a peculiar man during his entire life; he was self-contained, irritable and quick-tempered. He lived largely to himself, denied himself many of the comforts of life, and was not at all times cleanly in his personal habits and appearance. He was honest in his dealings; he managed his own affairs, and seems to have been of the type to decide for himself what he would and what he would not do. A witness who seems to be disinterested and who knew him well says:

"He always had his own opinion as to how he wanted his business done, and it was done that way or it wasn't done at all usually. I always thought he looked after his business successfully."

He kept bachelor's hall and lived by himself; he never remarried after coming to Iowa, and seems to have had few acquaintances and no intimate friends. At the time the will was signed, decedent was nearly 83 years of age. He had been sick for a short time, and when he signed the will, he was confined to his bed. The will was signed Saturday night, March 7, 1914, and he died the following Monday evening. The will gave the sum of $1 to each of the six contestants, and the remainder of the estate to the proponent. In prior years, he had manifested more or less feeling against all his children, including the principal legatee herein, and at times said that none of his children should have any of his property; yet he visited off and on with his son, the proponent. He manifested a love for his two grandchildren, the sons of the proponent, and there is some evidence that at times he felt kindly disposed towards two or three of his other children, contestants.

In the fall of 1913, deceased entered into a contract to

sell his land in Sac County for about $20,000, the conveyance to be made March 1, 1914; as usual, he spent the winter out of Iowa; but the latter part of January, 1914, he returned to the state and made his home in a boarding house in Des Moines for a time, staying there until February 26th, on which date he left Des Moines alone and started for Sac City, going by way of Newell. On the 27th of February, he transacted business in the bank at Newell, and on the 28th he reached Sac City; the weather was stormy; his asthma was bothering him. When he reached Sac City, he went to the office of W. H. Hart for the purpose of closing the sale of the land, and inquired of Mr. Hart in regard to a nearby rooming house, stating that it was too far for him to walk back and forth in his then condition from his son's house, a half a mile or more from the center of town. Mr. Hart says that deceased told him also that he did not want to go to his son's house; that his son was a bad man. The result was that he went to a rooming house and stayed until March 3d. However, he told Mr. Hart that, if his son came and inquired for him, he could tell him where he was, and the same day, the son, the proponent, went to see him. The son's wife and daughter were sick at the time, and proponent made no effort to have his father go to his house. On March 1st, proponent, went with his father to Hart's office to close up the land trade, the son assisting his father upstairs. The land transaction was closed. The testimony of the attorney and the other party to the land contract is that at that time deceased was perfectly sound in his mind; he left $17,000 in notes in the safe of Mr. Hart, the attorney, but took the certificates of deposit to the bank and took new certificates in his own name. That afternoon, proponent called upon deceased at the rooming house, and deceased told the son he did not feel well and asked what doctor the son employed, and was informed that Dr. Townsend had been generally employed. The deceased requested the son to see the doctor and have him come and see him. This the son did, but the doctor was in the country, and did

not call on deceased until March 3d, at which time the doctor says he diagnosed the trouble as asthma and capillary bronchitis. The doctor testifies:

"After I examined him, I told him he had better go over to E. J.'s (meaning the appellee's house). He said if he had a way to go he would go, and I told him I would take him over in my car, which I did. It was my suggestion that he went; he offered no objection. His mental condition was good. He was taken to the house of Emery J. Eveleth and put in a warm bed and I attended him."

Deceased had been getting better from the time he went from the rooming house to the son's home, but, from overeating or some other cause, he had a relapse. He sent for Dr. Townsend, who went to see deceased at half past ten on that Saturday night and examined him. Testator then asked the doctor if he was afraid to tell him the truth, and the doctor informed him he was not. Testator then asked the doctor if he was going to die now. The doctor told him he could not tell him he was going to die, but that his age and condition were against him, and that, if he had anything in a business way to do, he had better attend to it now. To this, testator replied, "I think that is plain enough," and he said, "I want to make a will." He requested them to get Mr. Hart. They attempted to do this by phone, and also Mr. McCord, but were unable to secure either. Mr. Currie was found at his office, and the doctor went and brought Mr. Currie to the place where deceased was. When Mr. Currie came, deceased was propped up in bed, and he inquired if Mr. Currie was a lawyer, and said he had made up his mind to have a will made. Materials were brought, and the attorney asked him how he wanted to make the will. He said he wanted his property to go to Emery J. Eveleth, his son—pointing him out where he was standing in a door between the room where the old gentleman was and the next room. Deceased asked Mr. Currie how much he would have to give the others in order to make a valid will, and was advised about that by

Mr. Currie, and also that deceased must make his own will. Deceased then asked if $1 would be sufficient, and was told by Mr. Currie that it would, and deceased said, "Give all the others $1 apiece, and give the rest of it to my boy, Emery." Deceased gave Mr. Currie the names of all his children. No one suggested anything to the old gentleman in any way about what he should do with his property, or in any manner aided him by suggestion or otherwise. There was one of his children whose name he could not remember because she had been married a second time, and as to this one he gave the lawyer the first name, and the doctor asked Mrs. Eveleth, who was in bed in another room, for the name, and Mrs. Eveleth told him; and another name he knew and gave, but could not spell it, and the doctor again asked Mrs. Eveleth. When this was done, deceased told the attorney, Mr. Currie, to give each of these $1 apiece, and gave as an excuse for doing so that they had never been good to him. Mr. Currie wrote the will in controversy according to the above directions, and then read it over to the old gentleman carefully and in a loud voice, because of the deafness of the old gentleman. Deceased started to read the will himself, and told Mr. Currie that he had spelled his given name erroneously, and the attorney interlined a letter. After looking over the will, he suggested that he thought Mr. Currie could read it better, and Mr. Currie did then read it and asked deceased if that was the way he wanted it, and he said, "Yes." The will was then executed.

We shall now notice some of the circumstances relied upon by appellant. Mr. Hart testified that, at the time he directed deceased to a rooming house, deceased said to him further that he did not want to go to proponent's house because he was afraid of his son; that he said, "I am afraid he would kill me if I went out there." Another witness testifies that, six or seven years ago, when Emery operated the farm of deceased, proponent was mad at his father when the old man told him to get out. Another witness testified that,

in 1902, when deceased was sick and proponent visited him, deceased would not have much to do with the son; that he would not take a drink called for by him and provided by the son, and that he seemed afraid to do so; that deceased made the witness wash out the glass in which his son had brought him the water to drink before he would drink out of it; said he would not trust him. At the time this testimony went in, the question of mental capacity was in issue, and this evidence would be competent on that question.

As to the claim in regard to guardianship, the proponent did write to his sister in Wisconsin, March 1, 1914:

"Dad is here now and has sold his farm near Newell and has got everything he has in money, and I don't think he is capable of looking after it. I am afraid someone will fool him out of it. He will be here a week and then he is going away and he don't tell anyone where he is going, and I think he had ought to have a garden appointed to look after him. He is in a bad shape and just sets and sleeps nearly all the time. Now if you can come, we will try and see what we can do. I don't sopose the rest wood want to do anything and don't know weather you do or not, but if we ever get any of it will have to look after it soon, for he is loosen his mind very fast and can't hear anything hardly. Well if you come you had better come this week. Come right away and we will try and fix it some way. I don't think he has long to live anyhow. Come if you can."

It is thought by appellant that this letter shows that proponent was attempting to take advantage of his brothers and sisters. It might be, perhaps, inferred from this that proponent was looking after the matter in his own interest, but it also shows a disposition on his part to look after his father, who was old, and who had converted his property into money and negotiable paper, and also to have his sister assume the responsibility with him. It is also thought by appellant that the fact that deceased gave proponent all the property, when during his life he had expressed a dislike for him, is

evidence that he must have done something to secure the execution of the will as it was finally made. It is true that he expressed a dislike for proponent, and he also expressed a dislike for his other children. He said at different times that none of his children should have any of his property. But, as before stated, he did express a liking for his grand-children, the children of proponent. The record shows that deceased was peculiar. The trouble he had had with his family evidently soured him. He was irritable and quick-tempered. Much that he said was evidently the expression of the moment, and either the result of old age or garrulousness or the manifestation of his temper. Appellant places much reliance on the fact that deceased said he was afraid of proponent; that he was a bad man and would kill him. The record shows that, whenever the old gentleman made remarks such as these, it was when he was in ill health or suffering, and the same condition existed at least 10 or 12 years before his death, as shown by the testimony we have before set out in regard to the transaction in 1902, when deceased would not drink water brought by proponent. The evidence shows that deceased had associations with his son many times after that date. This would not tend to show that deceased would make a will in favor of his son because of such feelings. On the other hand, appellants claim that the old gentleman had no ground for this feeling, and that there was no reason to believe that his son had any disposition whatever to hurt him, and that the condition of mind with which the old gentleman viewed his son was a delusion. The only other time that it is claimed by appellants that deceased manifested any fear was in regard to the testimony of Mr. Hart, about the first of March. Deceased was sick at that time. After 1902, deceased lived with proponent a whole summer. Under the record, we think these few expressions do not show that deceased had any real fear of proponent, or that he made the will or was in any way influenced because of such claimed fear.

We shall not set out the testimony of Dr. Townsend, who was present at the time the will was executed, nor of Mr. Currie, any further than has been done, but content ourselves with saying that these were the only persons present at the time the will was executed, except the son, who was in his own home, and there is no evidence from any of the witnesses present that anything was said or done by the proponent or anyone else to influence the deceased in any way in making the will as it was made. There is no evidence that the son took any part in the conversation. On the contrary, it appears affirmatively that he did not. There is evidence tending to show that proponent told his sister, or assumed to tell her, why the children in Wisconsin were omitted from the will, because they had not treated him right, or something of that kind. But it is not claimed that proponent stated that deceased said so, or how he got his information, and at most this would be only his opinion about that. And it is also said that an inference ought to be drawn because there was evidence tending to show that proponent did not tell some of the brothers and sisters of the provisions of the will.

We think the case is not as strong for appellants as some of our prior cases; for instance, *Johnson v. Johnson,* 134 Iowa 33. In that case, it was held that the evidence was not sufficient to go to the jury on the question of undue influence, and the holdings have been that on this issue; though, as said in some of the cases, undue influence is difficult to prove and must be proved if at all by circumstances, yet a case may not go to the jury upon inference alone. There must be substantive evidence showing acts that overcome the will of the testator, and the burden is upon the party charging undue influence, unless there is some fiduciary relation, which we hold does not exist in this case. See, also, upon this point *In re Estate of Townsend,* 128 Iowa 621, where the court said:

"The burden of proving undue influence, and that it operated upon the mind of the testator at the very time the

will was executed, to such an extent that the will was the result thereof, is upon the contestant. It is not enough to show that there was an opportunity to exercise the undue influence complained of. There must be evidence that it was exercised, and that it was instrumental in procuring the will. . . . Neither advice nor solicitation, however earnest and insistent, will vitiate a will, unless it be further shown that the freedom of the will [of the testator] was in some way impaired or destroyed thereby.''

In *Zinkula v. Zinkula*, 171 Iowa 287, we said:

''To entitle plaintiffs to recover, they must establish by a preponderance of the evidence that the instrument in question does not express the mind of the testator. To this end, one of two facts must affirmatively appear; either that the testator, at the time of the making of the will, was mentally incompetent to make a will, or that his mind was so unduly influenced by his wife in the making of it that it did not express his will and purpose, but rather, the will and purpose of his wife. There is no substantive evidence in the record that such is the fact. There is no evidence that the wife and mother did or did not do anything in regard thereto.''

See, also, *Brackey v. Brackey*, 151 Iowa 99, where the cases are reviewed and the rule stated.

As already stated, the appellants seek to bring this case within the rule that there is a shifting of the burden of proof because of the situation, and claim that the same rule ought to apply here as where a fiduciary relation is shown. But we think the evidence does not show that there was any such relation of trust or confidence between these parties as to impose any such burden upon the proponent. See *Burrow v. Hicks*, 144 Iowa 584. Everything that was said and done in regard to the execution of the will was shown in evidence. See further on the proposition last stated, *Chambers v. Brady*, 100 Iowa 622.

3. WILLS: undue influence: presumption.

Appellants cite *Sullivan v. Kenney*, 148 Iowa 361, 377;

*Spargur v. Hall,* 62 Iowa 498, and other cases. But these were cases where the facts were entirely different. In the *Sullivan* case, decedent was in a condition of collapse and in the hands of a trained nurse for a long time, and under the control and domination of the child who received the property.

The record is quite a long one, and we have, perhaps, gone into the details of the testimony more fully than necessary. But, without further discussion, we conclude that the court did not err in withdrawing the question of undue influence from the consideration of the jury.

2. The next error relied upon is in regard to the action of the court in permitting proponent too much latitude in the cross-examination of the witness Currie. Mr. Currie was called as a witness on the part of contestants

4. WITNESSES: cross-examination: discretion of court.

and was one of proponent's attorneys, and counsel say that he was asked certain preliminary questions to show that he was the draughtsman who wrote the will, and was then interrogated in reference to two matters: First, as to who was present in the room when the will was made; and, second, as to what deceased said, if anything, after the will was written and before it was signed, about his property's being taken away from him before his death. But the direct examination was a little broader than that, we think. One question, we notice, inquires as to whether the evidence in regard to taking property away from him was the substance of what he said, and, on cross-examination, the court permitted counsel for proponent to ask:

"Q. Who gave you directions as to how to draw this will?"

The answer, over objection, was:

"Oren K. Eveleth, the decedent, directed me how to draw the will. Nobody else was present taking any part in suggesting or saying how the will should be drawn. I didn't see E. J. Eveleth in the room."

The objection was that this was not cross-examination.

The appellants complain that other matters were brought out on cross-examination of this witness which went beyond the scope of the direct examination, and it may be that, strictly, it was beyond cross-examination. But this matter is so much within the discretion of the trial court that we think, under the circumstances, we ought not to hold that contestants have any just cause for complaint.

Furthermore, the cross-examination went in without objection, except as to one or two questions, but a motion was made at the end of the cross-examination to exclude. Dr. Townsend had already testified as to this same transaction, and as to deceased's telling the attorney how to draw the will. In so far as the cross-examination exceeded proper limits, if it did, the witness should be considered as a witness for the proponent, and, had contestants desired to cross-examine the witness as to such new matter, the court doubtless would have permitted it, if it had been asked. There are cases where we have held that a party, under the guise of cross-examination, should not be permitted to develop his own case and discredit a certain line of testimony, such as an expert witness; but such is not the situation here.

5. WITNESSES: cross-examination: harmless error.

3. This question was also asked of this witness on cross-examination:

"Q. Was there anything to indicate from the old man's appearance that he was under constraint from anybody?"

The last question was objected to for the reason that it called for an opinion, and witness answered:

6. EVIDENCE: conclusion: inability to adequately state facts.

"I saw nothing to indicate any constraint."

The argument is that this permitted the witness to pass upon the point to be determined by the jury. But we think the exception is not well taken. The witness was present and saw the deceased, and there are many times where it is difficult for a witness to describe so that a jury will get the impres-

sion that the witness had from seeing. In other words, there are many instances where an answer may partake somewhat of the nature of a conclusion, but it is descriptive, and so far partakes of fact that a witness, speaking from personal knowledge and acquaintance and observation, is qualified to testify upon the subject. *Moyers v. Fogarty,* 140 Iowa 701, at 712.

Appellant cites *Sever v. Minneapolis & St. L. R. Co.,* 156 Iowa 664, to the proposition that an expert may not give testimony which determines the ultimate fact which the jury is to pass upon, and such is the rule. But

7. WITNESSES: examination: usurping function of jury.

we think the question here does not determine for the jury the ultimate fact as to whether undue influence was or was not exercised. It is simply descriptive as to whether the witness saw any indications of deceased's acting under constraint. A situation could arise where, if, as claimed by appellants, the proponent was standing in a door to the room and in the presence of deceased, there might be an expression of the face or eyes that would indicate that deceased was acting under fear or constraint; but this witness testifies that he saw nothing to indicate constraint.

Complaint is also made by appellants because the two doctors were permitted to answer the following question:

"Q. What would you say, doctor, as to whether the testator at that time was capable of under-

8. EVIDENCE: opinion evidence: wills: mental competency.

standing in a general way the amount of his property and who were the natural beneficiaries thereof?"

This evidence was offered on the question as to the mental capacity of deceased. Both these witnesses were expert witnesses. One of them gave his opinion from a hypothetical question, and his answer was founded upon the entire life history of deceased; and the other witness, Dr. Townsend, was also a witness to the will. As we understand counsel for appellant, they concede that the case of *In re Overpeck's Will,* 144 Iowa 400, at 405, is against their contention, but

they ask that the case be overruled. But we are content with the holding in that case. It should be said, further, that the answers to the question before set out were in the affirmative. The rule may be different as to a person testifying to insanity or unsoundness of mind. In such case, the facts must be set out upon which the opinion is based. This is not required so fully where a witness testifies to sanity or competency, and a subscribing witness may testify as to mental condition without stating the facts further than that he saw and observed the party and his appearance and conduct at the time.

4. The contestants offered an instruction in this form:

"You are instructed that a deliberate written statement over a party's signature, inconsistent with a subsequent claim, is provable not merely to discredit his testimony, but as substantive proof against him."

9. TRIAL: instructions: emphasis on particular evidence.

This was refused, and of the refusal the appellants complain. We understand this instruction to refer to the letter from proponent to his sister, heretofore set out. This bears upon the question of the mental condition of deceased more than any other question. As stated, the letter itself and proponent's statements in reference thereto as a witness were before the jury, and doubtless counsel for contestants made the most of it in argument to the jury.

We think there was no error in the refusal to give the instruction. The letter was in evidence, and the proponent's explanation of some of the statements as to the reference to his father's mental condition was proper to be considered by the jury. But it was not the duty of the court to call specific attention of the jury to this evidence as distinguished from other evidence in the case. In some cases, it has been held improper for the court to emphasize or give undue prominence to evidentiary facts. See *Middleton v. City of Cedar Falls,* 173 Iowa 619; *Whitman v. Chicago, G. W. R. Co.,* 171 Iowa 277.

It often happens that letters or other documents con-

taining statements contradictory to statements of a witness are put in evidence for the purpose of impeachment, and in other cases, perhaps such a paper might be admissible as an admission. There is not reversible error at this point.

5. Error is assigned upon the refusal of the court to give Instruction No. 5, requested by contestants. The substance of this instruction is that, if the jury should find from the evidence that testator, at the time of making the proposed will, had sufficient capacity to attend to the ordinary affairs of life, yet, with regard to subjects connected with the testamentary disposition and distribution of his property and the natural objects of his bounty, he was not of sound mind, and, while laboring under such unsoundness of mind, he made the will in question, and in making it he was so far influenced or controlled by such unsoundness of mind as to be unable rationally to comprehend the nature and effect of the provisions of the said will, and was thereby led to make such proposed will as he did, then the jury would be justified in finding that it was not the last will of deceased. We think there was no error in refusing this, for the reason that the court instructed the jury very fully and very carefully on the question of mental capacity, and of the instructions given by the court, counsel do not complain. And this is true, also, of requested Instruction No. 8, in reference to the disinheritance of testator's children. This subject was embodied in instructions given by the court on its own motion.

10. TRIAL: requested instructions: refusal: subject covered by court's instructions.

6. The refusal of the court to give requested Instruction No. 10, offered by contestants, is assigned as error. This has reference to the testimony heretofore referred to, that deceased had stated that he was afraid of his son, the proponent, and that he was afraid his son would kill him, and that he was in fear of said son by reason of such delusion, and that, if the jury should find that the will was executed when deceased was under such delusion and because thereof, then

11. TRIAL: instructions: unsupported theory: will contest.

they should find for the contestants. As stated, appellants, in a prior assignment of error, have claimed that this threat should be considered as undue influence, or as bearing upon that question, and that the will was executed in favor of proponent because of the supposed threat. But the argument at this point is, as they state it, that:

"It has never been claimed by contestants, nor urged by proponent, that the record contains any evidence justifying fear of death at proponent's hands."

And they state, also, that testator did entertain that fear, and gave public expression of it. Appellants' position is somewhat inconsistent here. This matter seems to have been given but slight attention on the trial of the case. There is little, if any, medical testimony on the question of delusions. It is said by appellants that the refusal to give this Instruction 10 was error, because contestants had not pleaded that the will was the result of a delusion, and there was no evidence that testator was laboring under a delusion, or that the making of the will was influenced thereby. But the objection was that, at the time of the making of the will, deceased was of unsound mind and not competent. But we think, if there was any such delusion, there is not anything to show that it in any manner entered into or controlled the making of the will. To avoid the will, the delusion must in some manner relate to and be the reason for the making of the will in the manner in which it was made. In this case, if testator labored under a delusion such as claimed, the natural tendency would be for him not to make his son the recipient of his bounty. It is not claimed by appellants that there was any delusion in regard to the other children who were disinherited by deceased. The question of the soundness or unsoundness of the testator's mind at the time the will was made was fully and fairly submitted by the court to the jury. As we have already stated, there was no evidence that decedent executed the will because he was in fear that his son, the proponent, would kill or injure him. We think the entire

transaction, as shown by the testimony of those who were present, which is not disputed, shows that nothing of that kind was in the mind of the testator.

Without further discussion, it is our conclusion that, upon the entire record, contestants have had a fair trial, and that there is no prejudicial error in the record, and the judgment of the district court is therefore—*Affirmed.*

EVANS, C. J., DEEMER and WEAVER, JJ., concur.